Madeline BROWN, Plaintiff,

v.

William HENDERSON, Postmaster General of the United States Postal Service, Defendant.

No. 99 Civ. 744(VM).

United States District Court, S.D. New York.

Sept. 29, 2000.

**446**

Kevin P. Quill, Long Island City, NY, for plaintiff.

Ramon E. Reyes, Jr., United States Attorney, Southern District of New York, New York City, for defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Madeline Brown brings this action against William Henderson, Postmaster General of the United States Postal Service the ("Postal Service"), alleging employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and intentional infliction of emotional distress under New York State common law. The Postal Service now moves under Fed.R.Civ.P. 56(b) for summary judgment dismissing the discrimination claim. For the reasons discussed below, the motion is granted, and the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

## BACKGROUND

Madeline Brown, a letter carrier stationed at the James A. Farley Building ("JAF") in Manhattan, has been employed by the Postal Service for over 29 years. The ordeal that gives rise to this lawsuit began in January 1996, when a group of four male co-workers—Thomas Nelson, Angel Melendez, Bruno Moschetta, and Adel Yacoub—made Brown the target of a daily barrage of harassing comments suggesting that she and another co-worker, Thomas "Tiny" Parrett, were having a romantic affair. They would say things to both Brown and Parret such as "You [Parrett] and Mady [Brown] are in love—look at that—you are always talking," "are you going away for the weekend?," "you're always off the same days—what are you doing together?" Deposition of Madeline Brown ("Pl.Dep.") at 64–66, 92, 101. Brown testified at her deposition that because of the proximity of Parrett's mail route to the harassers', he suffered "the brunt" of harassing remarks, and, when pressed, she estimated that he had been subjected to the comments two to three

times more often than she. *Id.* at 69, 75, 93, 97, 100–01.

Brown endured these taunts until sometime in spring of 1996, when, according to her deposition testimony, she reported the harassing conduct to her immediate supervisor, Michael Goldheimer, who she claims did nothing to stop it. Pl.Dep. at 129–30. Goldheimer denies having ever been told. Deposition of Michael Goldheimer ("Goldheimer Dep.") at 15. In any event, in May or June of 1996, Brown confronted the harassers personally, she "finally [ ] couldn't stand anymore of it," and warned them that if it continued she would "bring charges against them." Pl.Dep. at 70. Despite Brown's warning, the harassers continued making such comments, to Parrett in particular, but substituted the aliases "Mary Lou" or "Matty Lou" to mask their references to Brown. Pl.Dep. at 70. The harassers then began loudly singing along to the Ricky Nelson song "Mary Lou" whenever it played on the radio. EEO Investigative Affidavit of Madeline Brown ("Pl. EEO Aff.") at 8.

Brown explained in her EEO affidavits and at her deposition that the animosity displayed toward her was due in large part to a longstanding, union related, personal conflict with the group of harassers, most significantly Nelson, whom she had battled in a "slanderous" shop steward election and accused of committing timecard fraud several years earlier. *See* Pl.Dep. at 6–8. Brown testified, in fact, that "if it hadn't been for the [union shop steward] election and all of that unpleasantness and told him that people were talking about him showing up three or four hours late this probably would not have happened. And I still believe that." Pl.Dep. at 64.

Brown also alleges that she was subjected to harassment when she overheard letter carriers Jacques Uscier and Samuel Fils–Aime threaten, in vulgar terms, to sodomize one another. Pl.Dep. at 109–110; Pl. EEO Aff. at 8. Brown additionally claims that on four or five occasions, Nelson called her a "pig," and that for a period of about two weeks, Uscier not only called her a pig, but made "oinking" and "suey" sounds as well. Pl.Dep. at 124–25. According to Brown, the harassers had also "needled" Parrett about his weight for years. *Id.* at 97–98.

On May 1, 1997, according to Brown, the sexual harassment escalated when someone posted "a pornographic picture of a naked, obese, spread-eagled woman masturbating" to a pole along Parrett's mail route. Pl. EEO Aff. at 4. Scrawled on the picture were the words "Tiny's Girl." Brown removed the picture, but less than an hour later, someone affixed to the same pole a postcard featuring mating elephants. *Id.* The postcard was itself taped to a piece of paper, upon which was written "Tiny and Mary Lou." Brown removed the postcard as well and reported the incident to Goldheimer, Lawrence Lynch, tour superintendent, and Carlos Hernandez, operations manager.

In response, Lynch notified the Postal Service's Inspection Service and Equal Employment Opportunity Office ("EEO") about the allegation, offered EEO counseling to Brown, and ordered that "service talks" be held throughout the section and entire station about sexual harassment. On May 5, 1997, Goldheimer held the first of two service talks. According to Brown, "[h]e simply walked around from route to route showing the carriers a piece of paper which said 'Do not hang any obscene photographs or literature on Rt. 0154.'" *Id.* Brown took offense to the manner in which Goldheimer conducted the service talk, which she characterized as unsympathetic and disrespectful, and asked him "how he would feel if those pictures had been taped to his podium with 'Mrs. Goldheimer' written on them?" Goldheimer allegedly became visibly angry and replied "It says 'Tiny's girl.' Is there something I should know?" *Id.*

The following day, supervisor Frank Vargas conducted a general service talk on sexual harassment within each section at the JAF. Brown concedes that since the service talks, "no other obscene picture or

postcard referring to me or Mr. Parrett has been posted on the workfloor." *Id.* But she claims that for the next three months, her co-workers taunted her anew, chanting "service talk service talk" whenever she was present. *Id.* at 5.

On May 30, 1997, Brown sought EEO counseling because of the alleged harassment.

Just a few days later, Brown claims that Fils–Aime insulted and threatened both her and Parrett, saying "fat people should be put in gas chambers," "fat people got something genetic, they're missing most of their brain, they shouldn't be allowed to live," and "if they write me up, I'll grieve it with an AK." *Id.* ¶ 22.

Brown reported the Fils–Aime threats to her supervisors and to the Postal Service's Inspection Service. The following day, Fils–Aime shouted at Uscier, in Brown's presence, "shoot 'em up, shoot Mary Lou!" Brown once again reported the incident to Goldheimer, who "glared furiously" and shouted "what are you going to do, run back upstairs to the inspectors?" Brown then reported the incident to the postal inspectors.

Goldheimer discussed the incident with Postal Inspector Stephen Attardi, who advised Goldheimer to take whatever disciplinary action against Fils–Aime he deemed necessary. Goldheimer Dep. at 33. Fils–Aime admitted to both Goldheimer and Lynch that he had made the statements, but denied that they were threatening. *Id.* On June 9, 1997, Goldheimer issued a warning letter to Fils–Aime charging him with "verbal abuse" and "threatening statements." Further, as a result of a complaint by Parrett about the same comments, Fils–Aime's mail route was moved away from both Brown's and Parrett's routes.

On October 6, 1997, following the mandatory pre-complaint counseling period, Brown filed a formal complaint with the Postal Service's EEO office.

Finally, in November 1997, letter carrier Larry Williams told Brown that he had seen obscene graffiti about her in the men's bathroom at JAF. Continued Deposition of Madeline Brown at 11–13. The graffiti portrayed a bare-breasted woman with exaggerated lips and a wide upturned nose, with the words "Mrs. Brown" written above. Brown entered the bathroom when it was empty and saw the graffiti herself. *Id.* About four weeks later, Brown photographed the graffiti and then informed Lynch, who in turn informed Hernandez, who filed a work order to have the stalls painted over only to find that the stalls had already been painted over.

On November 2, 1998, the Postal Service issued a final decision denying Brown relief on her EEO complaint. In February 2000, Brown initiated this action, alleging sex discrimination under a hostile work environment theory in violation of Title VII. The Postal service now moves for summary judgment, arguing, among other things (1) that the bulk of Brown's claims are time-barred because of her failure to seek an administrative remedy in a timely fashion, and (2) that the alleged harassment was directed at both Brown and Parrett, a man, and therefore cannot form the basis for a sex discrimination claim.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "exam-

ine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## II. *TIMELINESS OF ADMINISTRATIVE ACTION*

█ " 'Title VII is the exclusive remedy for discrimination by the federal government on the basis of race, religion, sex, or national origin.' " *Briones v. Runyon,* 101 F.3d at 289 (quoting *Boyd v. United States Postal Service,* 752 F.2d 410, 413–14 (9th Cir.1985) (citing *Brown v. General Services Admin.,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976))). Title VII requires a litigant to exhaust available administrative remedies in a timely fashion. *See Brown v. General Services Admin.,* 425 U.S. at 832–33, 96 S.Ct. 1961; *Pauling v. Secretary of Dept. of Interior,* 160 F.3d 133, 134 (2d Cir.1998); *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996). These time limits are prescribed in Equal Employment Opportunity Commission ("EEOC") regulations. *See* 29 C.F.R. §§ 1614.101, 1614.607. Before filing a formal complaint, a federal employee who believes she has been the victim of discrimination "must consult a Counselor ... in order to try to informally resolve the master." 29 C.F.R. § 1614.105(a); *Pauling,* 160 F.3d at 134. The employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." *Id.* § 1614.105(a)(1). The time limits established by Title VII and the regulation are "analogous to a statute of limitations, and [are], therefore, considered subject to waiver, estoppel, and equitable tolling." *Briones,* 101 F.3d at 290; *accord Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 94–95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990).

Brown first sought EEO counseling on May 30, 1997. Thus, according to the Postal Service, only that conduct which occurred after April 15, 1997—within the 45 day period immediately preceding the May 30, 1997 request for EEO counseling—is actionable. Brown counters that the conduct at issue constituted a continuing violation.

## III. *CONTINUING VIOLATION*

█ Where the conduct complained of may be deemed to constitute a continuing violation, allegedly harassing conduct that falls outside the forty-five day period nevertheless may be actionable as related to conduct that falls within the period. The Second Circuit has limited the application of the continuing violation doctrine to cases where there is (1) proof of a specific ongoing discriminatory policy or practice (such as discriminatory seniority lists or employment tests), or (2) where specific and related instances of discrimination are permitted by an employer to continue unremedied for so long as to amount to a discriminatory policy or practice. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); *Cornwell v. Robinson,* 23 F.3d 694, 703–704 (2d Cir. 1994). Discrete discriminatory acts not related to a discriminatory policy are not a continuing violation. *See Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993).

Brown argues that the "continuing atmosphere of sexual harassment" suffices to establish a continuing violation. Ongoing discrimination, however, is in itself insufficient to establish a continuing violation. There must be evidence that the alleged discrimination was related to either an actual or *de facto* policy or practice.

The hostile environment alleged by Brown involved several specific and related incidents. Brown claims that she informed Goldheimer as early as the spring of 1996 and that his work station was so close to the harassment that he could not

have been oblivious to it, but that he failed to take any action to abate it. Goldheimer has denied that Brown ever told him about the alleged harassment.

■ Whether Goldheimer was aware of the allegedly discriminatory conduct as early as spring 1996 would be a question for the fact-finder. If established, and if the underlying conduct qualifies as sex discrimination, it may constitute a continuing violation. Therefore, the Court will consider all of the alleged conduct in assessing whether a hostile work environment can be established.

The Court now turns to the conduct at issue, and whether, if true, it is actionable under Title VII.

## IV. HOSTILE WORK ENVIRONMENT

■ To establish a hostile work environment claim under Title VII, Brown must prove that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual advances or other verbal conduct of a sexual nature; (3) the harassment was based on sex; and (4) the harassment was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir.1993) Because the alleged harassment was perpetrated by co-workers, as opposed to supervisors, Brown must also establish that the Postal Service either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. See Richardson v. New York State Dep't of Corr., 180 F.3d 426, 440 (2d Cir.1999) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

■ Here, it is undisputed that Brown is a member of a protected class and was subject to unwelcome verbal conduct of a sexual nature. Whether the harassment was sufficiently severe to alter the conditions of Brown's employment would be a question left for the fact-finder. Brown's

failure to adduce evidence that the conduct at issue here was based on her sex, however, is fatal to her claim.

■ A Title VII plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination] ... because of ... sex.'" Oncale v. Sundowner Offshore Svcs., Inc. 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

> We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to the disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

Oncale, 523 U.S. at 81, 118 S.Ct. 998 (quoting Harris v. Forklift Systems, Inc. 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A plaintiff must demonstrate that she was subjected to the hostility because of her membership in a protected class. "[A]n environment which is equally harsh for both men and women ... does not constitute a hostile working environment under the civil rights statutes." Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310 (2d Cir.1999). Put bluntly, "the equal opportunity harasser escapes the purview of Title VII liability." Holman v. State of Indiana, 24 F.Supp.2d 909, 915 (N.D.Ind.1998); accord Butler v. Ysleta Independent School Dist., 161 F.3d 263, 270 (5th Cir.1998) ("Irwin's sending of offensive materials to both men and women is evidence that the workplace itself, while perhaps more sexually charged than necessary, was not sexually charged in any way that made it a hostile work environment for either men or women"); Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 517 (7th Cir.1996) ("[H]arassment that is inflicted without regard to gender, that is, where males and females in the same set-

ting do not receive disparate treatment, is not actionable because the harassment is not based on sex").

Here, the undisputed evidence demonstrates that the harassing conduct was directed at both Brown and Parrett. Indeed, Brown admitted repeatedly in her various informal and formal EEO complaints and affidavits that the alleged harassment was directed at both her and Parrett. Brown also testified at her deposition that the comments regarding the alleged affair were directed at both of them, and in fact, were directed at Parrett more often. Similarly, Parrett testified at his deposition that the alleged harassment was directed at both him and Brown, and in his EEO affidavit he wrote, "I felt all along that these remarks were meant for me." *See* Thomas Parrett EEO Investigative Affidavit. The pornographic photograph and postcard were undeniably directed at both Brown and Parrett, naming Parrett and having been posted on Parret's route. Even the graffiti, which singled out Brown, was drawn in the men's, not the women's, bathroom. In addition, Brown stated several times in her EEO filings and at her deposition that the harassment was largely motivated by a longstanding personal union-related feud she has had with the harassers.

■ Brown's and Parrett's belated attempts to create an issues of fact in this regard, by filing post-motion affidavits stating that the harassment was based on gender, must be rejected. A party may not "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion, that, by omission, or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996). Here, both Brown's and Parrett's affidavits contradict their respective deposition testimony and prior affidavits, and therefore, cannot create a genuine issue of material fact.

As cruel and harassing as the conduct alleged here undeniably was, Brown cannot show that it was motivated by gender so as to bring it within the scope of Title VII. As a matter of law, the sex discrimination claim must be dismissed.

## V. *RETALIATION*

Although not explicitly pleaded as such in the complaint, the Fils–Aime's threats could conceivably form the basis for a retaliation claim.

■ To establish alleged retaliatory harassment by a co-worker, a Title VII plaintiff must prove, among other things, that (i) the alleged retaliatory harassment was sufficiently severe to constitute an adverse change in the terms and conditions of her employment, and (ii) her employer knew about but failed to take action to abate the retaliatory harassment.

■ Assuming for the purpose of this matter that Fils–Aime's threats are sufficiently severe to constitute an adverse change in the terms and conditions of Brown's employment, the Postal Service nevertheless took prompt action to abate the alleged retaliatory harassment. After Brown reported the threats to her supervisors and to the Inspection Service, Goldheimer issued a letter of warning charging Fils–Aime with verbal abuse and threatening statements. Additionally, Fils–Aime's mail route was moved further away from Brown's and Parrett's. Fils–Aime made no further threats.

Consequently, Fils–Aime's retaliatory conduct cannot, as a matter of law, be attributed to the Postal Service.

## VI. *SUPPLEMENTAL JURISDICTION*

Having disposed of all federal claims raised in the complaint, the Court declines to exercise supplemental jurisdiction over the remaining state law claim for intentional infliction of emotional distress. *See generally Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994) (a district court may decline to exercise supplemental jurisdiction based on "considerations of judicial economy, convenience, and fairness to litigants").

### CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

ORDERED that the Postal Service's motion for summary judgment is granted, and the complaint is dismissed in its entirety.

The Clerk of Court is directed to enter judgment for the defendants and close this matter.

SO ORDERED.