**Madeline E. BROWN, Plaintiff–Appellant,**

v.

**William J. HENDERSON, Postmaster General of the United States Postal Service, Defendant–Appellee.**

**Docket No. 00–6347.**

United States Court of Appeals, Second Circuit.

Argued May 29, 2001.

Decided July 24, 2001.

---

Kevin P. Quill, Long Island City, NY, for Plaintiff–Appellant.

Ramon E. Reyes, Jr., Assistant United States Attorney, for Mary Jo White, United States Attorney for the Southern District of New York (Jeffrey S. Oestericher, Assistant United States Attorney, on the brief), for Defendant–Appellee.

Before: CALABRESI and KATZMANN, Circuit Judges, and KAPLAN,* District Judge.

CALABRESI, Circuit Judge:

Plaintiff-appellant Madeline E. Brown, a letter carrier for the United States Postal Service (the "Postal Service")[1], was harassed by her co-workers in their Manhattan workplace. The question on appeal is whether this harassment occurred because of Brown's sex, so as to bring it within the ambit of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1 *et seq.* The district court concluded that, as a matter of law, it did not. We agree, though on narrower grounds.

*Background*

Brown claims that she was subjected to sex discrimination in employment by virtue of a campaign of harassment that originated in a bitterly contested 1995 union election. In that election, plaintiff's chief antagonist was Thomas Nelson, who, with others, succeeded in ousting Brown from her post as union shop steward, a position she had held for eighteen years. The conflict between Brown and Nelson had begun just before the election when Brown criticized Nelson for repeatedly arriving hours late to work.

Plaintiff alleges that the "low and vicious ... campaign of rumors and slander" continued beyond the conclusion of the election. In particular, Nelson frequently mocked Brown for being "a slob," for being overweight, and for certain modifications in her duties which resulted from an injury that she had suffered earlier. He accused her of spreading lies about him and "sa[ying] a lot of hostile stuff about the union which really wasn't sexually harassing; very hostile and very angry." Nelson also made fun of a purported romance, denied by Brown, between her and a married co-worker, Timothy "Tiny" Parrett. In this respect, Nelson and a group of co-workers habitually engaged in public speculation about the nature of Brown's and Parrett's relationship, teasing both of them for being lovers and for spending weekends together, and adding insulting references to the weight of both Parrett and Brown.

According to Brown, the bulk of the conduct focusing on her relationship with Parrett occurred in conversations, outside her presence, between the harassers and

---

\* The Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

1. Brown has sued William Henderson, the Postmaster General of the United States Postal Service (the "Postmaster General"), in his official capacity. For convenience, we will refer to both the Postmaster General and the Postal Service as the defendant-appellee in this case.

Parrett. This was facilitated by the proximity of Parrett's mail route to those of Nelson and the other antagonists. Even before the union election, Parrett himself had, for a long time, faced a pattern of workplace "needling" about his weight and "anything they can think of."

In addition to Nelson, plaintiff identified several other co-workers as contributing to the harassment, primarily by joining in the speculation about her relationship with Parrett. She also complained that, because she was stationed next to co-workers who engaged in a steady stream of obscene conversation, she necessarily overhead their "vile" talk, though they never referred to her directly or attempted to pressure her into participating in their conversations. When she objected, however, they became abusive and mocked Brown's weight and eating habits.

Besides this verbal harassment, Brown mentions two incidents in which she was graphically caricatured. In the first, a magazine picture of a naked, obese woman masturbating was posted near Parrett's mail route and captioned "Tiny's Girl." After Brown removed the picture, another image was placed in the same spot, this one showing two elephants mating above the words "Tiny and Mary Lou." [2] Within days of this event, Postal Service supervisors held a series of "service talks" on sexual harassment; these included specific instructions against the posting of any obscene pictures. Brown alleges that her co-workers harassed her for instigating these service talks, and that her supervisors neither took her complaints seriously nor acted aggressively to suppress future harassment. Thus, although no more pictures were placed in the work area, about six months after the talks there was another

incident involving a sexually explicit cartoon of Brown. In this one, a vulgar picture was drawn in a men's bathroom, though not one regularly used by Parrett.

In her complaint to the Postal Service's Equal Employment Opportunity ("EEO") office, which she filed after the "Tiny's Girl" incident but before the bathroom graffiti, Brown made clear that her "first and foremost" complaint about her workplace was the verbal harassment by Nelson and his cohort. In the midst of a full account of "why Nelson and his friends hated me so much," Brown also explained that management disliked her because of her conscientious advocacy as shop steward. And she went on to recount how her conflict with Nelson began with their clash over his working hours and evolved into the disputed union election. Significantly, nowhere in her detailed statement did she allege, either explicitly or implicitly, that any hostile actions were taken because of her sex. Again, in an affidavit supplementing her EEO complaint, plaintiff explained that "I am proud to say that I was a very good steward. I won a lot of grievances, helped a lot of people, and saved quite a few jobs. For this, more than anything else, Nelson and his friends envied and hated me and tried to make me less than human." And in her deposition after this suit was filed, Brown once more emphasized that her dispute with Nelson was the sole cause of the hostility toward her:

> I believe that the reason—the original reason for Mr. Nelson's behavior and the harassment I was suffering had to do with my time as a shop steward.... And I believe that Mr. Nelson for various reasons if it hadn't been for the election and all of that unpleasantness

---

**2.** According to Brown, who sometimes goes by "Matty," her harassers often referred to her as "Matty Lou" or "Mary Lou."

and [if I hadn't] told him that people were talking about him showing up three or four hours late this probably would not have happened. And I still believe that.

Only after defendant moved for summary judgment did plaintiff submit an affidavit alleging that the workplace abuse was "gender[ed] in nature and attacked me because I am a woman." Up to that point, her explanation of what rendered the conduct at issue *sexual* harassment centered exclusively on the fact that some of it concerned sexual acts, possessed sexual connotations, or related to the purported sexual relationship between her and Parrett.

When the Postal Service found no merit in plaintiff's administrative complaint, Brown brought suit in district court, alleging both sex discrimination by virtue of a hostile work environment and retaliation for her complaints. Once discovery had been completed, defendant moved for summary judgment on a number of grounds, and the district court granted the motion.

The district court's reasons for granting summary judgment centered on deficiencies in plaintiff's proof that the harassment she experienced was "because of sex," as is required for there to be Title VII liability. *See Brown v. Henderson,* 115 F.Supp.2d 445, 450–51 (S.D.N.Y.2000). In particular, the court focused on the fact that both Brown and Parrett experienced workplace harassment, and that much of the verbal commentaries, as well as the graphic depictions of Brown, had Parrett, not Brown, as their most immediate audience. Based on these considerations, together with the evidence that the conduct at issue stemmed from the union election, the court concluded that Brown's allegations amounted to no more than the charge that she happened to be a female victim of "equal opportunity harassment," and not,

as required for Title VII liability, someone who experienced workplace harassment because of her sex. The court also ruled that, to the extent her complaint could be read to allege retaliatory harassment, this claim was barred by the Postal Service's prompt remedial action. On appeal, Brown challenges only the district court's judgment with regard to her sex discrimination claim and does not press her retaliation claim.

*Discussion*

## I. Summary Judgment Standard

■ We review *de novo* the district court's grant of summary judgment. *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998). To prevail on its summary judgment motion, the moving party must show that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir.2001). In discrimination cases, the inquiry into whether the plaintiff's sex (or race, etc.) caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a "sparing" use of the summary judgment device because of juries' special advantages over judges in this area. *Distasio,* 157 F.3d at 61; *accord Gallagher v. Delaney,* 139 F.3d 338, 342 (2d Cir.1998) (noting juries' possession of the "current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications").

 Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See Distasio,* 157 F.3d at 61. She must come forth with evidence sufficient to allow a reasonable jury to find in her favor. *See McCarthy v. New York City Technical College,* 202 F.3d 161, 167 (2d Cir.2000). Moreover, factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 455 (2d Cir.1999); *Raskin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997).

## II. Title VII Standards for Proving Sex Discrimination

 To show that she was subjected to sex discrimination by virtue of a hostile work environment, Brown must ultimately prove "conduct (1) that is 'objectively' severe or pervasive—that is, [conduct that] creates an environment that a reasonable person would find hostile or abusive [the 'objective' requirement], (2) that the plaintiff 'subjectively perceive[s]' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex ... [the 'prohibited causal factor' requirement]." *Gregory v. Daly,* 243 F.3d 687, 691–92 (2d Cir.2001) (internal citations and quotation marks omitted, all but first brackets in original). Because Brown claims harassment by co-workers, not supervisors, she must also show (4) that the Postal Service is responsible for the continued hostility of the work environment. *See Distasio,* 157 F.3d at 62.

On appeal, the Postal Service primarily challenges plaintiff's proof of the third of the four requirements, and urges that the district court correctly ruled that there could be no discrimination "because of sex" where both a woman (Brown) and a man (Parrett) were harassed. This argument, while it does point to a relevant evidentiary consideration, cannot, however, end the necessarily individualized and fact-sensitive inquiry into why Brown was treated as she was.

 It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In determining whether an employee has been discriminated against "because of *such individual's* ... sex," 42 U.S.C. § 2000e–2(a)(1) (emphasis added), the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace. *See Connecticut v. Teal,* 457 U.S. 440, 453–54, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) ("The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole."); *City of Los Angeles, Dep't of Water and Power v. Manhart,* 435 U.S. 702, 708, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978).

 As a result, discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex. *See Teal,* 457 U.S. at

455, 102 S.Ct. 2525 ("Congress never intended to give an employer license to discriminate against some employees . . . merely because he favorably treats other members of the employees' group."); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination."); *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996) (rejecting the argument that plaintiff's replacement by a worker of the same race precluded the establishment of a prima facie case of race discrimination). Similarly, the application of discriminatory policies to individuals cannot be justified by their even-handed effects on women and men as classes or in the aggregate. *See Manhart,* 435 U.S. at 708–09, 98 S.Ct. 1370 (rejecting employer's argument that requiring female employees to make larger pension contributions than male employees is not discriminatory because, "unless women as a class are assessed an extra charge, they will be subsidized, to some extent, by the class of male employees"). And, whether an employer discriminates against only a subset of a protected class, *see, e.g., UAW v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (considering a policy applicable only to unsterilized women of child-bearing age), or discriminates inconsistently, Title VII nevertheless protects any individual so long as that individual is mistreated because of her sex. *See Pivirotto v. Innovative Sys. Inc.,* 191 F.3d 344, 354 (3d Cir.1999).

■ Discrimination may, of course, also confer an illegal blanket advantage on members of one group over another—men for example over women. Indeed, the mechanisms by which discrimination occurs within the workplace are often such that they systematically do just that. For this reason, and to underscore such cases, courts have sometimes spoken of the "because of sex" requirement loosely in global terms. Thus, we ourselves have on occasion said that "an environment which is equally harsh for both men and women . . . does not constitute a hostile working environment under the civil rights statutes." *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999); *see also Oncale,* 523 U.S. at 80, 118 S.Ct. 998 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (internal quotation marks omitted). But, when we have focused on the issue, we have also made clear that it is discriminatory treatment of a given individual that matters. Thus, though it is helpful in proving sex discrimination, we have held that it is not strictly necessary for a plaintiff to identify an employee who was treated more favorably than the plaintiff and who was similarly situated to the plaintiff, except for being of the opposite sex. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467–68 (2d Cir.2001) (applying this analysis to age discrimination); *see also Gerdom v. Cont'l Airlines, Inc.,* 692 F.2d 602, 607–08 (9th Cir.1982) (in banc) ("The statute is not limited in its protection to those job classifications which include both genders.") And the Supreme Court has likewise consistently found that it is the use of an individual's sex (or race, etc.) in setting the terms or conditions of employment that is Title VII's touchstone, regardless of whether such discrimination is part of a broader discriminatory pattern. *See Teal,* 457 U.S. at 453, 102 S.Ct. 2525; *Furnco Constr. Corp.,* 438 U.S. at 579, 98 S.Ct. 2943; *Manhart,* 435 U.S. at 708–09, 98 S.Ct. 1370. In other words, what matters in the end is not how the employer treated *other* employees, if any, of a different sex,

but how the employer *would have* treated *the plaintiff* had she been of a different sex. *See Carson,* 82 F.3d at 158.

An example makes clear why this is so. Two workers share the same supervisor. A new supervisor takes over who despises women and Southerners. One of the two employees is a woman from New York; the other is a man from Georgia. The new supervisor fires both employees, explaining to the woman "I just don't want any women working for me," and telling the man "I just don't want any Southerners working for me." It is obvious that the woman was discriminated against *because of her sex,* and this fact is in no way negated merely because the supervisor also fired the male co-worker.

■ That being said, in the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex. *Cf. Abdu–Brisson,* 239 F.3d at 468 (noting that identifying disparities in treatment between similarly situated employees who differ only with regard to a protected characteristic is "a common and especially effective method of establishing the inference of discriminatory intent"); *Pivirotto,* 191 F.3d at 354 ("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence."). And this inference is not necessarily eliminated even if some of the harassment has sexual content. *See Butler v. Ysleta Ind. Sch. Dist.,* 161 F.3d 263, 270–71 (5th Cir.1998) (upholding summary judgment for defendants where a school principal sent lewd and insulting anonymous letters to both men and women); *Pasqua v. Metro. Life*

*Ins. Co.,* 101 F.3d 514, 517 (7th Cir.1996) (rejecting a Title VII claim arising out of rumors of a workplace affair, where both a male and a female employee were the subject of the rumors and "[t]here [was] not even a hint in the record that any rumors or vulgar statements" about the relationship "were made *because* [plaintiff] was a male").

■ Nonetheless, the inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved. For it may be the case that a co-worker or supervisor treats both men and women badly, but women worse. *See Smith v. First Union Nat'l Bank,* 202 F.3d 234, 238–39, 242 (4th Cir. 2000) (rejecting the argument that a female plaintiff could not have been harassed on account of her sex because both men and women complained about the alleged perpetrator, where the supervisor in question subjected plaintiff "to a barrage of threats and gender-based insults"); *McDonnell v. Cisneros,* 84 F.3d 256, 260 (7th Cir.1996) ("It would be exceedingly perverse if a male worker could buy his supervisors and his company immunity from Title VII liability by taking care to harass sexually an occasional male worker, though his preferred targets were female."). Or, as in the example discussed earlier, a woman might be abused in ways that cannot be explained without reference to her sex, notwithstanding the fact that a man received treatment at least as harsh, though for other—non-sexual—reasons. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994) (finding adequate evidence of sex discrimination where, "while [a supervisor's] abuse of men [was] in no way related to their gender, his abuse of female employees, especially [plaintiff], centered on the fact that they were females"). Finally, there might

even be circumstances that are actionable under Title VII when both men and women suffer sexually discriminatory harms in the same workplace, but for different reasons. This could occur, for example, if an employer discriminated against women, but not men, who were overweight, *see, e.g., Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 454 (D.C.Cir.1976); *Gerdom*, 692 F.2d at 606–08, and against men, but not women, who dated overweight people. *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 891–92 (11th Cir.1986) (holding that an employer had discriminated against a white employee, based on his race, when it refused to hire him because of his interracial marriage, and finding that such discrimination against the white employee was consistent with the possibility that the employer also discriminated against African–Americans generally); *cf. Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (striking down law prohibiting marriage between whites and non-whites because it imposed an unconstitutional racial classification on both partners).

## III. Application to the Facts on Appeal

 Accordingly, and turning to the case at hand, we do not find dispositive the fact that much of the challenged conduct had Parrett as its most immediate victim and audience. To the extent that co-workers' conduct toward Parrett, or other men in the workplace, revealed their hostility toward Brown, or was part of a campaign to isolate her from workplace allies, *on account of her sex*, such conduct could contribute to the creation of an actionably hostile work environment for plaintiff. *See Schwapp v. Town of Avon*, 118 F.3d 106,

111 (2d Cir.1997) ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." (internal citation omitted)); *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 105–06 (5th Cir.1988) (finding sex discrimination where plaintiff's entire case rested on the placement in men's restrooms of cartoons that "depict her engaged in crude and deviant sexual activities," where the cartoons could interfere with plaintiff's ability to "deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse"). And this remains so whether or not Parrett also suffered as a result of that harassing conduct.

 Nonetheless, we conclude that in the case before us Brown has not carried her burden of showing—even for purposes of avoiding summary judgment—that the harassment she faced was rooted in her sex. The bulk of the behavior she cites, though often highly cruel and vulgar, related either to her union-related conflict with Nelson or to her purported affair with Parrett. Most importantly, both in the statements she made in support of her EEO complaint and in her deposition, plaintiff repeatedly explained that Nelson and the others were harassing her as an outgrowth of their dispute over the union election. And she never suggested that their antagonism toward her was related to her being a woman.[3] Instead, until her affidavit in opposition to summary judgment, Brown gave every indication that, in

---

**3.** Thus, this is not a case in which the union-related dispute was itself rooted in or exacerbated by Brown's gender. In fact, she had successfully been a shop steward for many years, seemingly without gender-related problems, and only was attacked after a dispute with Nelson that was unconnected to her sex. Similarly, there is no indication that the mockery of her relationship with Parrett was related to her being a woman.

her view, what made her tormentors' conduct "sexual harassment" was the fact that the behavior touched on matters of sexuality, *i.e.* her purported sexual relationship with Parrett, and not that it was a form of sex discrimination.

The only basis for linking the harassers' conduct to Brown's sex is the fact that the bathroom cartoon and one of the pictures posted near Parrett's mail route both relied for their effect upon a depiction of a naked female body. In some cases, this connection to plaintiff's sex has sufficed to support the inference that there was a sex-specific character to the course of conduct. *See Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir.1996) (finding sufficient evidence of sex discrimination where harassment took the form, *inter alia*, of a "cartoon directed at plaintiff, depicting a woman pulling up her skirt and spreading her legs"); *Bennett*, 845 F.2d at 106; *cf. Steiner*, 25 F.3d at 1463 (holding that a reasonable jury could find discrimination based on sex where the harassment in question "relied on sexual epithets [and] offensive, explicit references to women's bodies and sexual conduct"). Here, however, there is overwhelming evidence that the hostility toward Brown was grounded in workplace dynamics unrelated to her sex and that even these pictures did not reflect an attack on Brown *as a woman*. Moreover, and crucially, this overwhelming evidence derives substantially from Brown herself, and her own view, clearly expressed, that the harassment was fundamentally the product of a workplace dispute stemming from the union election, and not from her being a woman. Given her repeated statements to that effect, we are reluctant to allow her to rescue her claim with a last-minute conversion to the position that, instead of what she had consistently said before, she faced adverse conditions because she is a woman. *See Bickerstaff*, 196 F.3d at 455 ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." (internal quotation marks and ellipsis omitted)); *Raskin*, 125 F.3d at 63. Accordingly, we agree with the district court's conclusion that, as a matter of law, Brown cannot show that she suffered the harassment in question because of her sex.

### Conclusion

■ We hold that, though there is no *per se* bar to maintaining a claim of sex discrimination where a person of another sex has been similarly treated, on the facts of this case plaintiff cannot show that she was discriminated against because of her sex. We therefore AFFIRM the judgment of the district court.