**Ruth HILL, Plaintiff,**

v.

**TACONIC DEVELOPMENTAL DISABILITIES SERVICES OFFICE, a subdivision of the New York States Office of Mental Retardation and Developmental Disabilities, David Sucato, in his individual capacity, Dan McNeill, in his individual capacity, and Katherine Bainer, in her individual capacity, Defendants.**

No. 00 Civ. 4631(CM).

United States District Court,
S.D. New York.

Sept. 22, 2003.

---

Christopher Watkins, Goshen, NY, for Ruth Hill.

Laura V. Jones, Eliot Spitzer, Attorney General, State of New York, New York City, for Taconic Development Disabilities Services Office, a subdivision of the New York State Office of Mental Retardation and Developmental Disabilities, David Sucato, in his individual capacity, Dan McNeill, in his individual capacity, Katherine Bainer, in his individual capacity.

## MEMORANDUM DECISION AND ORDER ON REMAND

MCMAHON, District Judge.

Plaintiff Ruth Hill, an African–American female, filed a complaint on June 20, 2000, bringing claims under 42 U.S.C. §§ 1981, 1983, and 2000e *et. seq.* and New York

Human Rights Law, Executive Law § 296 against her employer, the Taconic Developmental Disabilities Services Office ("TDDSO") and her supervisors, David Sucato, William D. ("Dan") McNeill and Katherine Bainer for employment discrimination based on her race. On January 4, 2002, I granted in part and denied in part defendants' motion for summary judgment. *Hill v. Taconic Developmental Disabilities Services Office, et al.*, 181 F.Supp.2d 303 (S.D.N.Y.2002). The January 2002 decision contains a lengthy recitation of the underlying facts and familiarity with that decision is assumed.

On April 18, 2002, the individual defendants filed a notice of appeal seeking interlocutory review of, *inter alia*, the portion of the January 2002 decision in which I denied the motion of the individual defendants for summary judgment on the claims under 42 U.S.C. §§ 1981 and 1983 ("Section 1981" and "Section 1983"). On January 2, 2003, the Second Circuit remanded this matter for further particularized findings concerning the issue of qualified immunity as to the three individually named defendants (and for no other purpose). *Hill v. Taconic Developmental Disabilities Services Office, et al.*, 57 Fed. Appx. 9 (2d Cir.2003). The Second Circuit's express purpose in remanding for further particularized findings was to insure that it did not overstep the bounds of its interlocutory appellate jurisdiction. Following remand, I gave the parties the opportunity to brief the issue of qualified immunity with respect to each individual defendant.

Insofar as is relevant here, plaintiff has sued the individual defendants for intentional racial discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") and the Equal Protection Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983 ("Section 1983"). In the January 2002 decision, I found that there was a genuine issue of material fact as to whether plaintiff would prevail in a claim against TDDSO for a hostile work environment, actionable under 42 U.S.C. § 2000-e5 ("Title VII"). For purposes of determining the existence of a hostile work environment, claims under Section 1981 and Section 1983 are analyzed under the same framework as Title VII claims, but Section 1981 and Section 1983—unlike Title VII—provide a cause of action against individuals. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir.2000) (holding that individuals may be held liable under Section 1981; acknowledging that hostile work environment claims under Section 1981 are assessed under the Title VII framework); *Meckenberg v. New York City Off-Track Betting*, 42 F.Supp.2d 359, 384 (S.D.N.Y.1999) (explaining that Section 1983 provides a cause of action against "any person" acting under color of law who deprives another person of federal rights; acknowledging that hostile work environment claim under Section 1983 is assessed under the Title VII framework). Here, however, the individual defendants are all state actors, so any claim against them for violation of plaintiff's rights under Section 1981 or the Equal Protection clause of the Fourteenth Amendment is actionable exclusively under Section 1983. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (holding that Section 1983 provides the exclusive federal damages remedy for violation of the rights guaranteed by Section 1981 when the claim is against a state actor); *Roddini v. City University of New York*, No. 02 Civ. 4640, 2003 WL 435981 at *5 (Feb. 21, 2003) (holding that, under *Jett*, individuals sued in their individual capacities who are state actors must be sued under Section 1983 for violations of the rights guaranteed by Section 1981).

Herewith my understanding of the law of qualified immunity, my particularized

findings (viewing all facts most favorably to plaintiff, the non-moving party on this motion for summary judgment, *Ford v. Reynolds,* 316 F.3d 351, 353 (2d Cir.2003)), and the conclusions that follow therefrom:

### A. The Doctrine of Qualified Immunity

The Second Circuit's most recent discussion of the convoluted doctrine of qualified immunity came only this June, in *Stephenson v. John Doe, Detective,* 332 F.3d 68 (2d Cir.2003). Like most qualified immunity jurisprudence, it involved an allegation of police brutality—the one field in which the doctrine arguably makes some sense.

This case is in just the sort of posture where the meaning of qualified immunity becomes muddy. In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court indicated that qualified immunity ought to be decided by the Court at the earliest possible opportunity—preferably at the outset of the case, which is a point at which plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial. This suggests that the relevant inquiry should be whether the law is in fact well-settled—because if it is, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Claims that a public officer made a reasonable mistake of fact "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." *Stephenson,* 332 F.3d at 78 (*citing Saucier,* 533 U.S. at 205, 206, 121 S.Ct. 2151).

 There can be no doubt that the law barring discrimination against a person on the basis of race—including via a hostile work environment—is "well-settled." Therefore, assuming *arguendo* that a plaintiff raises a genuine issue of material fact about whether she was the victim of discrimination by a particular state officer defendant, it seems logically impossible that a state officer defendant could be entitled to qualified immunity *as a matter of law*—i.e., because the law was not clearly established or because he/she had no reason to know of the relevant legal standard.

To put the point in the context of our case: defendants argue that they are entitled to qualified immunity because their allegedly discriminatory actions amount to no more than "failure to support plaintiff in her disputes with subordinates, coworkers and consumers." They urge that no clearly established precedent makes such "failure to support" an "adverse employment action." However, if a jury concluded that the defendants created a hostile work environment (an adverse employment action) by consistently refusing to support plaintiff in her job *because she was black* (which is the gravamen of her constitutional claim), I fail to see how they could defend against liability on the ground that (1) the relevant law was not clearly established or (2) they neither knew nor should have known that it was settled. Either they behaved toward plaintiff on the basis of improper considerations—in which case plaintiff's well-settled right to be free of a racially-motivated hostile work environment was violated—or they did not, in which case they win, either on summary judgment or at trial, without recourse to qualified immunity.

So the issue is whether plaintiff has raised a genuine issue of material fact entitling her to a trial on her claim of discrimination against any of the three individual defendants. It is to that that I now turn, freely confessing that I cut cor-

ners the last time around in the hope of getting this case to trial quickly—and thus resolving it eighteen months ago.[1]

### B. *Findings as to Defendant McNeill*

■ William D. ("Dan") McNeill was plaintiff's direct supervisor at TDDSO for a ten month period beginning in December 1997 and ending in October 1998. During that period, plaintiff alleges that McNeill was disrespectful and rude to her and that he did not treat white supervisors—those that she claims are similarly situated to her—in such an abusive manner.[2] Plaintiff claims that an example of McNeill's abusive behavior was when he yelled at her and threw her out of his office in the presence of other (white) employees. McNeill does not deny this incident. He claims that his behavior was not motivated by plaintiff's race and but, rather, was due to the fact that she was inappropriately discussing personnel matters in front of other employees and consumers.[3]

Plaintiff claims that McNeill's unequal treatment of the white and black supervisors extended to the orders and assignments he gave them. For example, plaintiff alleges that McNeill instructed plaintiff not to counsel subordinates who refused to take direction from her, but did not similarly tie the hands of white supervisors. Plaintiff also alleges that McNeill delegat-ed her evening shift assignments and schedules to a white day shift supervisor, Tara Osborne.[4] And plaintiff further alleges that white supervisors were allowed to have input into changes/operations in their units, but she and the Hudson were not allowed to give such input. McNeill and Bainer respond that McNeill had the ultimate responsibility to determine assignments, and that plaintiff's only complaint is that they did not always follow her suggestions.

In addition, plaintiff claims that she had a dispute with Joseph Motolla, a white subordinate, in which Motolla yelled at her and "stormed out of the office." Plaintiff contends that, although McNeill spoke to her and Motolla about the incident, McNeill credited Motolla's account of the incident and failed to take appropriate action against Motolla.

■ McNeill was also plaintiff's supervisor from 1991 through 1995, while plaintiff was working at Kennedy Hall. At Kennedy Hall, there were two black supervisors, plaintiff and a woman named Leomie Hudson. Hudson and plaintiff both complain that McNeill discriminated against them on the basis of their race when he was their supervisor at Kennedy Hall. (*See* Affidavit of Leomie Hudson). While it is true that I dismissed as time barred any

---

1. Contributing to this court's delay in processing the case on remand was the fact that at least half of the relevant portions of the record appeared to have disappeared somewhere between the Court of Appeals and this Court.

2. Plaintiff was the only black supervisor in the building she worked in at that time.

3. The developmentally disabled adults that participate in the programs at TDDSO are referred to as "consumers."

4. McNeill argues that on this point plaintiff has manufactured a conflict between her affidavit—in which she makes the claim about Osborne—and her deposition testimony. I recognize that if there were actually a conflict between Hill's deposition and her subsequent affidavit I could not consider the affidavit on this motion. *Brown v. Henderson*, 257 F.3d 246, 256 (2d Cir.2001). However, plaintiff contends that there is no conflict, because the reference to which defendant adverts referred to the so-called twenty eight day schedule rather than daily staffing shift assignments. Where the alleged discrepancy is not clear from the face of the two documents, it is the jury's role to decide if any discrepancy really exists. I cannot do that on a motion for summary judgment.

claim of discrimination during that period, evidence that McNeill treated the black employees at Kennedy Hall differently than he treated white employees is relevant evidence that a jury could consider in assessing that intangible, but essential, element of defendant's state of mind that inheres in every discrimination case. Plaintiff submits that there were a series of incidents during that period that evidenced different treatment and hostile environment due to her race. McNeill does not address this evidence at all, apparently believing that, because the incidents are not actionable, they are not relevant. I beg to disagree. The facts alleged by plaintiff, if proved, might cause a reasonable trier of fact to conclude that McNeill harbored discriminatory animus and acted on it at a time when her claims were not barred by the statute of limitations.

If a jury credits plaintiff's allegations, it may reasonably conclude that McNeill acted with discriminatory intent towards plaintiff and thus aided in the creation of a hostile work environment. There are genuine issues of material fact as to whether defendant McNeill is liable to defendant for racial discrimination, actionable under Section 1983. Because the laws prohibiting racial discrimination in the work place were well-settled at the time of the alleged violations, defendant McNeill is not entitled to qualified immunity as a matter of law.

### C. *Findings as to Defendant Bainer*

Defendant Katherine Bainer was a "Team Leader" at the TDDSO, and was plaintiff's second-level supervisor during the relevant time period—March 1998 to July 2000.

Plaintiff makes few allegations of directly discriminatory behavior by Bainer. The major "incident" that plaintiff alleges involved a difficult consumer named Debra Bonnell. After Bonell (an undisputedly violent and racist consumer that plaintiff had difficulties with) complained of inappropriate behavior by staff members, Bainer allowed Bonnell to tape record in her unit. Bainer testified that she thought allowing Bonnell to make the tapes would make her feel more secure and in control, but when staff members complained about the taping, the administration concluded that it violated the rights of other clients and staff, and it was stopped. Before the taping ceased, Bonnell allegedly told staff members, including plaintiff, that she would use the "secret" tapes to "get them fired."

Plaintiff also alleges that Bainer ordered her to complete an assignment that plaintiff had tried to reassign to a subordinate—a "close observation" of a consumer. Plaintiff claims that it was not customary for supervisors of her level to perform close observations. Defendants respond with evidence of other supervisors who have performed close observations, including a white supervisor and Bainer herself.

█ Plaintiff's allegations of direct actions against Bainer, standing alone, are not sufficient evidence of discriminatory behavior.[5] But the gravamen of plaintiff's complaint against Bainer is not that she herself acted in a discriminatory manner, but that Bainer was aware that plaintiff was subjected to racial discrimination by way of a hostile work environment and failed to intervene. So plaintiff's claims against Bainer are premised not on Bainer's direct acts, but on a theory of supervi-

---

**5.** I have previously rejected plaintiff's claims that Bainer and Sucato retaliated against plaintiff, and I do not revisit that finding here.

sor liability—that Bainer is liable for not intervening to stop McNeill's discriminatory behavior.

I have determined that there is a genuine issue of material fact as to whether plaintiff suffered racial discrimination at TCCOS as a result of the actions of McNeill. Bainer (as the "team leader") was McNeill's supervisor. And according to plaintiff's sworn testimony, she informed Bainer of incidents involving McNeill that she felt were motivated by her race. *See* Hill Aff., 20 (complained to Bainer that NcNeill stripped her of "key supervisor responsibilities" including not allowing her to make decisions about consumer room assignments, but allowing white supervisors to make such decisions, and giving her scheduling responsibilities to a white day-shift supervisor), 24 (complained to Bainer that McNeill threw her out of his office, that she had never seen him behave this way with the other— white—employees). Moreover, Bainer was aware that, during the time that plaintiff and McNeill were working at the Kennedy facility, African–American employees, including plaintiff, had complained to the affirmative action officer that McNeill discriminated against her on the basis of her race. (Bainer Deposition, 24:3–26:16)

██ A qualified immunity determination under a theory of supervisor liability is more complicated than one for direct liability. In 2001, in *Ford v. Moore,* the Second Circuit recognized that the law regarding qualified immunity in cases of supervisor liability was ambiguous, but declined to resolve the ambiguity. 237 F.3d 156, 163 n. 4 (2d Cir.2001). Last year, the Circuit resolved the issue in *Poe v. Leonard,* holding that a supervisor defendant is shielded by qualified immunity unless; (1) the law violated by the defendant's subordinate is clearly established and (2) the supervisory liability doctrine under which the plaintiff wishes to hold the defendant liable is clearly established. 282 F.3d 123, 134 (2d Cir. 2002).

I have found that satisfaction of the first element cannot be resolved as a matter of law—a trier of fact must determine whether the actions of McNeill were racially discriminatory as to plaintiff. If they were, then McNeill violated clearly established law. I turn now to the second element—the doctrine of supervisor liability.

██ For claims brought under Section 1983, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (*quoted in Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001)). Personal involvement of a supervisory official may be established "by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." *Id.*

The doctrine of supervisor liability under Section 1983 was clearly established at the time of the alleged violation. And I again conclude that it is a question of fact, and not a matter of law, whether it is applicable under the facts of this case. If plaintiff's rendition of the facts prevails, a rational jury might conclude that, for in-

stance, Banier exhibited deliberate indifference to the plaintiff's rights by failing to act on information indicating that her constitutional right to equal protection was being violated. Because the determination of both elements of Bainer's liability under Section 1983 depend on the resolution of factual disputes—as opposed to legal disputes—Banier is not entitled to qualified immunity as a matter of law.

### D. *Findings as to Defendant Sucato*

At all times relevant hereto, David Sucato was Director of TDDSO. Plaintiff's only allegation of direct actions taken against her by Sucato concern his involvement in effectuating her termination from TDDSO. Because I have dismissed plaintiff's claim based on retaliatory termination for failure to raise a genuine issue of material fact, plaintiff's only possible recovery against Sucato must be based on a theory of supervisory liability.

In or about May 1998, plaintiff filed an internal complaint with TDDSO's Affirmative Action office based on, *inter alia,* McNeill's behavior. And according to McNeill, in May or June 1998, he and Tara Osborne requested a meeting with Sucato to discuss racial tensions at TDDSO. (McNeill Deposition, 20:8–13) At the meeting, Sucato confirmed that there was an investigation being conducted by "the central office or Albany." *Id.* at 23:17–19.

Sucato had been aware of plaintiff's concerns about racial discrimination prior to her May 1998 complaint. On June 1, 1998, Sucato stated in a confidential interoffice memorandum that "It may be that the actions of Ruth Hill, Leomie Hudson, and Kivea Greene are somehow interconnected. My memory is that they worked at Kennedy Hall at the same time a few years ago when concerns about the treatment of minority staff members were being expressed." (Watkins Aff., Ex. 20.)

In June 1999, plaintiff sent a letter to Sucato in stating that "[a]s you know, several months ago I filed complaints of racial discrimination and harassment with affirmative action. As of this date I have not heard one word from affirmative action as to the status of my complaints, and there has been no improvement in the oppressive working conditions." (Watkins Aff. at Ex. 11.)

My findings with respect to Sucato are thus similar to my findings with respect to Bainer. It was well established at the time of the alleged violation that plaintiff had a right to be free from racial discrimination in the work place, and it was well established that, under certain conditions, a violation of that right could support a claim against a supervisor under Section 1983. It is a question of fact, and not a matter of law, whether the circumstances in this case support findings of an underlying violation and of supervisor liability against Sucato. So Sucato is not entitled to qualified immunity as a matter of law.

### E. *Conclusion*

In short, while the evidence adduced by the plaintiff is thin, there is sufficient evidence in the record to warrant a trial on the underlying issue of discrimination as to all three individual defendants.

The parties are directed to appear for a final pre-trial conference on October 3, 2003 at 2:00 p.m. and are thereafter on forty-eight hour notice for trial.

This constitutes the decision and order of the Court.