Arthur L. WHALEY, Plaintiff,

v.

CITY UNIVERSITY OF NEW YORK, Sophie Davis School of Education, Gregory H. Williams, Individually and as President of the City College of the City of New York, Marthe R. Gold, Individually, and as Chair of the Department of Community Health and Social Medicine of the Sophie Davis School of Biomedical Education, and Stanford A. Roman, Jr., Individually and as Dean of the Sophie Davis School of Biomedical Education, Defendants.

No. 04 Civ. 7107(CM).

United States District Court, S.D. New York.

April 24, 2008.

Sandra Dorothy Parker, Law Office of Sandra D. Parker, New York NY, for Plaintiff.

Michael Robert Klekman, Office of the Attorney General, New York NY, for Defendant.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

Plaintiff Arthur Whaley ("Dr. Whaley" or "plaintiff"), a professor with the Sophie Davis School of Biomedical Education ("Sophie Davis"), sued his former employer after he was not reappointed. The amended complaint alleges that the defendants (i) discriminated against plaintiff on account of his race in violation of Title VII, 42 U.S.C. § 1983, and 42 U.S.C. § 1981 by, among other things, forcing him to respond to his offer of employment within 24 to 48 hours, refusing to give him a new computer, excluding him from a faculty

search committee, and initially denying him certain research and administrative assistance; (ii) discriminated against plaintiff on account of his race and age in violation of the New York State Executive Law § 296 ("NYHRL"), and New York City Admin. Code § 8–107 et seq. by engaging in these same practices; and (iii) retaliated against plaintiff in violation of Title VII by terminating his employment. The City University of New York ("CUNY"), Sophie Davis, Gregory H. Williams ("President Williams"), Marthe R. Gold ("Dr. Gold"), and Stanford Roman, Jr. ("Dean Roman") (collectively, the "defendants") have moved for summary judgment dismissing plaintiff's complaint. For the reasons set forth below, defendants' motion is granted in part and denied in part. What is left of the case will be tried on July 21, 2008.

## BACKGROUND

The facts are set forth in the Defendants' Local Rule 56.1 Statement and Plaintiff's Response to Defendants' 56.1 Statement. For the most part, the salient facts are not disputed.

### A. The parties

Plaintiff Arthur L. Whaley is a 49–year-old African–American male who was appointed to the position of Medical Professor (Basic Sciences) without tenure in the Department of Community Health and Social Medicine ("CHASM") at Sophie Davis, an academic unit of City College (a senior college of CUNY) for the period July 1, 2001 through August 31, 2002 at a salary of $90,000. He was reappointed to that position for the 2002–2003 academic year. He was not reappointed for the 2003–2004 academic year and his employment at CUNY ended, effective August 31, 2003.

Defendant City University of New York ("CUNY") is a New York State education-al institution, with its principal place of business in New York, New York.

Defendant Sophie Davis School of BioMedical Education ("Sophie Davis"), an educational institution, is part of the City College of the City University of New York ("City College"). City College and Sophie Davis are part of the CUNY system. Their principal place of business is New York, New York.

Defendant President Williams is an African–American male, age 63, who has been President of City College since August 2001. Pursuant to CUNY's Bylaws, a college President's responsibilities include: "the duty to recommend to the chancellor for appointment, promotion, and the granting of tenure only those persons who he/she is reasonably certain will contribute to the improvement of academic excellence at the college."

Defendant Dr. Gold is a white female, age 56, who has been the Arthur C. Lofan Professor and Chair of CHASM at Sophie Davis since February 1997. She was awarded tenure as a Full Professor at Sophie Davis in 2001. Dr. Gold, as a department chairperson, is the executive officer of her department. Among her responsibilities are to arrange for careful observation and guidance of the department's instructional staff members and to generally supervise and administer the department.

Defendant Dean Roman is an African–American male, age 64, who has been the Dean of Sophie Davis since 1990. Between 1999 and August 2001, he also served as Interim President of City College.

### B. Facts

#### 1. The recruitment of Dr. Whaley and his first-year reappointment

During the first half of 2000, Dr. Whaley applied for a position as Director of the

Population Health Laboratory at CHASM. He later informed Dr. Gold that he had decided not to pursue the position.

In or about September 2000, Dr. Whaley contacted Dr. Gold and expressed interest in a position of Associate or Full Professor of Epidemiology. The responsibilities of the position, as summarized in the CUNY Personnel Vacancy Notice (the "PVN") were:

> To contribute to the Department's formal teaching responsibilities within the areas of epidemiology and health services; to develop an integrated research program in epidemiology with emphasis on social determinants of health status through use of secondary and/or primary data sources; to participate in interdisciplinary research and program evaluation involving primary care and/or community interventions; and to collaborate with, and mentor junior faculty and post-doctoral fellows.

Among the qualifications required for the position were a "track record of scholarship and successful grant writing in social epidemiology, urban health, or related disciplines," and "commitment to and successful history of collaboration in a team-oriented environment." (Defs. Ex. E.)

In 2000, Dr. Whaley applied for the position, submitting a cover letter, his curriculum vitae, and a list of five references.

Dr. Tanya Pagan Raggio ("Dr. Raggio"), who identifies herself as an African–American, Puerto Rican, Italian/Sicilian American, was chair of the search committee that interviewed Dr. Whaley. Dr. Raggio, Dr. Lubetkin, Dr. Gold, Dean Roman, and others interviewed plaintiff for the position.

During the interview process, Dr. Whaley requested appointment at the full professor level rather than associate professor level. Dr. Whaley was the committee's top candidate, and the committee recommended that Dr. Whaley be offered the full professor position. Originally, Dr. Gold wanted to offer him an associate professor position, which was the position advertised.

According to plaintiff, Dean Roman stated, during the course of plaintiff's interview with him, that Dr. Gold only wanted to hire white females for faculty positions at CHASM. (Whaley Decl. ¶ 23.) Nonetheless, in April 2001, Dr. Gold phoned Dr. Whaley to offer him a position at the full professor level for the period July 1, 2001 through August 31, 2002. Dr. Whaley also received a formal offer letter from Dean Roman, on behalf of CUNY, dated April 4, 2001, which recommended an appointment at the rank of full Medical Professor. According to Dr. Raggio and Dr. Whaley, Dr. Gold initially informed Dr. Whaley that he must accept or reject the offer within 24 hours. She then allegedly gave Dr. Whaley an additional 24 hours. Dean Roman's letter, however, set no time limit on acceptance.

By letter, dated April 10, 2001, Dr. Whaley "enthusiastically" accepted the offer and wrote that he would now "be in a position to help build a research program integrated with clinical practice through your network of primary care settings."

The salary range listed in the PVN for Dr. Whaley's position at the full medical professor level was $68,096 through $97,469, and Dr. Whaley was offered $90,000, near the top end of the range. His employment began on July 1, 2001.

At CUNY, instructional staff appointments are only for the period specified in the letter of appointment. There is no presumption that employment will continue beyond the period indicated. First reappointment notifications at CUNY should be given no later than April 1 during the first full year of service. In Dr.

Whaley's case, the notification of his reappointment for the 2002–2003 academic year was not due until April 1, 2002. However, due to a staff error, Dr. Whaley was offered reappointment in November 2001.

### 2. Duties and responsibilities of a Full Medical Professor

For Dr. Whaley's position as a Full Medical Professor (Basic Sciences), the CUNY Bylaws provide that:

> It shall be the responsibility of assistant medical professors (basic sciences), associate medical professors (basic sciences), and medical professors (basic sciences) to perform teaching, research and guidance duties. They shall also, among other things, be responsible for committee and program related assignments within the division, department, academic unit or university. They shall perform those administrative, supervisory or other functions as may be assigned by the appropriate college or university authorities.

(Defs. Ex. MM.)

For appointment to Dr. Whaley's position as a Full Medical Professor (Basic Sciences), a candidate must have all the qualifications of an assistant medical professor (Basic Sciences), which includes a "willingness to cooperate with others for the good of the institution." In addition, a candidate should possess "a record of exceptional intellectual, educational and professional achievement. There shall be evidence of his/her continued growth." (Defs. Ex. MM.)

### 3. Dr. Whaley's race discrimination/racially hostile work environment claims

Dr. Whaley claims that he suffered race discrimination and a racially hostile work environment during his years on the So-phie Davis faculty. His amended complaint contains a laundry list of items allegedly motivated by racial animus.

#### i. Computer issue

When Dr. Whaley started at Sophie Davis in July 2001, he was offered the computer used his predecessor, Dr. Harvey Brenner, ("Dr. Brenner"), a white male. The computer had been used for less than six months. Dr. Whaley was not the only professor who received a used computer. When Dr. Erica Lubetkin, ("Dr. Lubetkin"), a white female, was hired as an assistant professor in CHASM in July 1999, she initially received a used computer. (Gold Decl. ¶ 22.) Likewise, when Dr. Raggio was hired as an associate professor in CHASM in October 1998, she received a lightly used computer that had been purchased three to four months prior to her arrival. (Gold Decl. ¶ 22.) And, upon his hire, Dr. Haiomia Jia, a Chinese male, also received a used computer. (Gold Decl. ¶ 22.) Nonetheless, Dr. Whaley alleges that he was denied a new computer based on his race.

#### ii. Research assistant issue

Before Dr. Whaley's arrival at Sophie Davis, by email, dated June 22, 2001, he identified Arianne Miller as a graduate student who had volunteered to work with him without compensation for the summer in completing some projects on a previous grant. Dr. Whaley told Dr. Gold that he was "not going to submit a formal request to hire her for pay." (Gold Decl., ¶ 25; Ex. L.)

Subsequently, Dr. Whaley made a formal request to hire Ms. Miller to help him develop his upcoming course in epidemiology for the Fall 2001 semester and to establish his research at CHASM. Dr. Gold initially denied the request; plaintiff claims that Dr. Gold only granted the request to hire Ms. Miller after he pointed

out that Dr. Brenner, his predecessor, had been allowed to hire a research assistant. (Whaley Decl. ¶ 38.) Dr. Brenner had been assigned a research assistant because the assistant's salary was paid from funds Sophie Davis received from a university in Germany, where Dr. Brenner had a part-time appointment. (*Id.*) Dr. Whaley, on the other hand, did not bring any grant funding with him from the Psychiatric Institute which could be used to pay for a research assistant. (Gold Decl., ¶¶ 23–24.) Nonetheless, Sophie Davis hired Ms. Miller for a month, using the school's own funds to pay her salary.

### iii. Administrative support issue

Yvonne Kilpatrick, an African–American female over age 50, has been Director of Administration and Community Liaison in CHASM since 2002. Plaintiff alleges that Yvonne Kilpatrick initially denied his request to obtain administrative assistance with grant preparation. According to plaintiff, Ms. Kilpatrick changed her position after plaintiff pointed out that such assistance was permitted in accordance with general university policy. (Whaley Decl. ¶ 40.)

Ms. Kilpatrick assigned Charlotte Thomas, an experienced civil service CUNY Office Assistant who in 2001 had been working in CHASM for over 15 years, to provide support services to Dr. Whaley for his course, such as copying of course materials.

Plaintiff claims that Ms. Kilpatrick instructed Ms. Thomas to contact her regarding every assignment by plaintiff, to ensure that it was course-related. Plaintiff alleges that no such requirement was imposed on white faculty members of CHASM. (Whaley Decl. ¶ 40.)

### iv. Health Policy Search Committee issue

When Dr. Whaley joined the Sophie Davis faculty in July 2001, the Health Poli-cy Search Committee, a faculty search committee at Sophie Davis, had just concluded the first phase of its search for a Health Policy faculty member. The search had not been successful. (Gold Decl. ¶ 29.) The committee re-opened the search in Fall 2001. Plaintiff alleges that he was not invited to become a member of the committee; however, he does not allege that he actually sought to become a member of this committee. According to plaintiff, Dr. Gold merely asked Dr. Whaley to participate "informally" in the work of the committee. (Pl. 56.1 Statement ¶ 48.) Dr. Gold, however, stated that she asked Dr. Whaley to join the committee, but he declined because of other work commitments. (Gold Decl. ¶ 28.)

Plaintiff also alleges that Dr. Gold did not invite Dr. Raggio to become a member of the committee. (Pl. 56.1 Statement ¶ 47.)

Dr. Whaley insists that all these slights were motivated by his race.

### 4. Age discrimination claim

In his amended complaint, Dr. Whaley alleges that these slights were also motivated by age discrimination. As evidence, Dr. Whaley cites an alleged remark by Dean Roman to Dr. Whaley that Dr. Gold had difficulty dealing with "senior" faculty. (Am. Cplt. Ex. I, ¶ 41.) President Williams, Dean Roman, Dr. Gold and Yvonne Kilpatrick are all older than Dr. Whaley. (Williams Decl., ¶ 1; Roman Deck, ¶ 1; Gold Decl., ¶ 2; Kilpatrick Decl., ¶ 1.)

### 5. Retaliation claim

Dr. Whaley alleges that defendants CUNY and Sophie Davis declined to reappoint him after the 2002–2003 school year in retaliation for his complaints about their discriminatory conduct.

### i. Protected activity: Dr. Whaley's December 4, 2001 letter to Dean Roman and the subsequent meetings

A disagreement with Dr. Gold over a grant proposal prompted Dr. Whaley to write a letter to Dean Roman, complaining of discriminatory treatment.

On Monday, December 3, 2001, Dr. Whaley left a grant transmittal form for a PSC–CUNY grant application with Dr. Gold's secretary for a small internal research grant of approximately $9,000. He did not leave the "full" grant package, which includes the substantive proposal and the budget. Dr. Gold told Dr. Whaley that she wanted to receive a "full package" before signing off. Dr. Gold ultimately signed the transmittal form that same day, but after the 2:00p.m. submission deadline. It was then given to Dean Roman, who signed it.

Dr. Whaley felt that Dr. Gold's request for the full package was an attempt to "micromanage" him and that such behavior was "unacceptable." (Defs. Ex. Q.)

On December 4, 2001, Dr. Whaley sent a letter to Dean Roman, with copies to Dr. Gold and Dr. Raggio, in which he complained of Dr. Gold's behavior. Specifically, he asked Dr. Gold to "alter[ ] her management style and general attitude toward [him] as a full professor of color," and further stated, "I am writing this letter both to start to document similar incidents and to ask for your assistance in this matter." (Defs. Ex. Q.) Dr. Whaley claimed that Dr. Raggio, with whom he was sexually involved while employed at CHASM, was similarly mistreated. (Defs. Ex. Q.)

In response to the letter, Dean Roman held three meetings with Dr. Whaley: two alone, and one in January 2002 with Dr. Whaley and Dr. Gold. During these meetings, Dean Roman supported Dr. Gold's view that she should receive a full grant package before signing off. He also informed Dr. Whaley that, like Dr. Gold, he also expected a full package when asked to sign off, but stated that he had made an exception in the case of this grant only because of the time constraints and on the strength of Dean Roman's respect for Dr. Gold and her prior sign-off on the proposal.

According to Dr. Whaley, during these meetings, Dean Roman also said that he wanted the December 24, 2001 letter to "disappear" and implied that the letter would have negative repercussions on Dr. Whaley's career at CHASM. (Whaley Decl. ¶¶ 52–59.) Dr. Whaley also claims that Dr. Gold threatened legal action against him because he called her a racist. (Whaley Decl. ¶ 55.)

### ii. Subsequent letters between Dr. Whaley and Dean Roman

Following the three meetings held by Dean Roman, Dean Roman sent Dr. Whaley a letter, dated January 14, 2002, in which he summarized the positions he had taken in those three meetings. He also expressed concern:

> ... about [Dr. Whaley's] ability to engage as a member of the faculty in your department and the School in a truly constructive, collegial manner that does not recognize every frustration, criticism or even assistance as harmful or disrespectful to you. Frankly such a scenario would dilute and erode the considerable talents [he] can exhibit and make [him] less effective in addressing true abuse except in theory.

(Roman Decl. ¶ 20; Defs. Ex. DD.)

By letter, dated February 25, 2002, Dr. Whaley responded to Dean Roman's January 14, 2002 letter. In that response, Dr. Whaley asserted that his Chair's oversight of his academic activities was disrespectful. (Defs. Ex. FF.) He also mentioned the

prior "insinuations of adverse effect on [his] tenure process" and Dr. Gold's threat to take legal action against him. (Id.)

Dean Roman responded to Dr. Whaley's letter by letter, dated March 19, 2002, in which he denied that Dr. Whaley was ever threatened with legal action or even withholding tenure, explicitly or implicitly, during the aforementioned meetings. Specifically, Dean Roman stated:

> ... I find your comments about your wanting to discuss the situation rationally, professionally and unemotionally somewhat disingenuous. You and I had two very productive, professional, and unemotional meetings without any specific request on your part. I clarified the role of Chair and my expectations that Chairs would review grant submissions from their faculty. I acknowledged your potential and expressed my desire to facilitate a positive, constructive relationship with your Chair after what I felt were actions that did not evince your best judgement. I inquired why you chose to copy that letter to a fellow faculty member in a matter that was between you and your Chair? ....
> It is untrue that you were ever threatened with legal action or even withholding tenure, explicitly or implicitly, in either of my meetings with you or our meeting with Dr. Gold. Since I have never threatened, nor would I tolerate threatening a faculty member or administrator with legal action or withholding tenure as a way to make a point, I find this untruth extremely disturbing.... I must be concerned about the intent of your letters.... [A] pattern is emerging. Although you wish others to respect and believe you rather freely, as I did with respect to our discussions as well as your incomplete explanation of your activities at Boy Harbor, you seem to strive to establish guarded or adversarial relationships by your own actions.

> This is of particular concern since this has occurred during a period of only six months. A time during which most new faculty of whatever rank would consult constructively with their Chair and others on institutional and academic policies to facilitate their transition ... While I welcome discussion with you about any specific issue as I do with any faculty member, I do not wish to engage in continuing written correspondences that do not advance the matter to a higher plain but instead continue to revise and embellish issues that beg closure after several months, several written correspondences, and three meetings.

(Defs. Ex. FF.)

Dr. Whaley did not respond to Dean Roman's March 19, 2002 letter.

### iii. Dr. Whaley's annual evaluation in June and July 2002

On June 20, 2002 and July 1, 2002, Dr. Gold met with Dr. Whaley to discuss his first annual performance evaluation at Sophie Davis. The discussion focused on the criteria upon which decisions to reappoint at CUNY are based: namely, teaching effectiveness; scholarly and professional growth and service to the institution.

According to Dr. Whaley, Dr. Gold twice mentioned during these meetings that Dr. Whaley had called her a racist. However, Dr. Whaley does not recall her ever stating that she was holding his comments against him. (Whaley Depo. Tr. pp. 208–209, Ex. III.)

Following the meetings, Dr. Gold sent Dr. Whaley a written evaluation of his performance, dated July 8, 2002. (Defs. Ex. R.) In her cover memo to Dr. Whaley, Dr. Gold wrote, "Let me know if you have questions/comments re the enclosed." (Defs. Ex. R.)

The written evaluation prepared by Dr. Gold focused on the criteria upon which decisions to reappoint at CUNY are based, and outlined several areas of concern: the direction of research priorities; progress in grant submissions providing investigator support; reassessment of participation in departmental and school activities; review of collaboration with other members of the Department and School on curriculum matters; and review of collaborations with other members of the Department and its partners on research opportunities. (Defs. Ex. R.) Dr. Gold's written evaluation of Dr. Whaley contains no reference to the December 4, 2001 letter.

In Dr. Gold's academic judgment, Dr. Whaley's performance, particularly in the areas of scholarly and professional growth and service to the institution, showed deficiencies. (Gold Decl. 137.)

### a. Lack of grants

Obtaining grants is a fundamental measure of a faculty member's scholarship and professional growth in the science and medical fields, in which outside funding is necessary to support the research and scholarship conducted in those fields. Both Dr. Gold and Dean Roman, in their sworn statements, stated that Dr. Whaley's grant funding activities were deficient. (Gold Decl. ¶ 38; Roman Decl. ¶ 24.)

The evaluation states that Dr. Whaley submitted proposals for two grants while at Sophie Davis the $4500 PSC/CUNY grant and a $375,000 National Institute of Mental Health ("NIMH") grant. The NIMH grant was not funded. Dr. Gold's evaluation states: "Dr. Whaley had informed me that he intended to resubmit a revised version of [the NIMH] grant for July 1, but has delayed a resubmission to the fall cycle." (Defs. Ex. R.)

Thus, Dr. Whaley was awarded funding for only one grant while at Sophie Davis—the internal PSC/CUNY grant. The standards for the award of internal PSC/CUNY grants are much less rigorous than for grants awarded by outside sources, such as the NIMH.

### b. Lack of "fit" and "service to the department and school"

In her evaluation of Dr. Whaley, Dr. Gold pointed out a number of weaknesses related to his "fit" within the department and his lack of service to the school. Specifically, she stated:

Dr. Whaley and I have had candid conversations with respect to his fit within this Department. He has expressed his perception of greater than anticipated administrative requirement for faculty for service to the school and his concern about its impact on his scholarship and academic career. He has informed me that he will be weighing the suitability of his fit here over the next year. In turn, I have observed to him that his service and administrative responsibilities have been more circumscribed that those of other faculty members and instructional staff (i.e., he does not serve as a student advisor, does not mentor student projects, serves on only one standing committee for the school, has carried no administrative responsibilities within the Department) and that his engagement in departmental activities have been less that I had anticipated or find desirable.

(Defs. Ex. R.)

In addition, she stated that both she and Dr. Whaley "share concerns about whether this will be a good long term home for him, given his career interests and aspirations, and the needs of this Department and this School." (Id.) Specifically, Dr. Gold was concerned about the lack of congruence between Dr. Whaley's research and the research priorities of Sophie Davis, as well as Dr. Whaley's lack of collaborative ef-

forts with members of the Sophie Davis school and institutional partners. She stated:

> We discussed previous conversations, both prior to his joining the faculty, and early in his time within the Department regarding my expectations of this faculty line's involvement in facilitating research seminars as well as research initiatives that were congruent with Departmental priorities in primary care and/or community interventions involving extant partners. Requirements for partnering with our collaborators and team work are laid out in the position announcement and the invitational letter for interview.
>
> Dr. Whaley's ongoing work on inpatient mental health diagnosis and treatment have less salience to the Department's focus than other of Dr. Whaley's interests in community-based interventions (e.g., the teen violence and condom use work). I have continued to encourage him to consider how he might align his research interests with this Department's clinical campus of community health centers in a manner that cultivated opportunities for collaboration, both with other faculty members and with institutional partners.

(Id.)

Dr. Whaley's testimony and the undisputed evidence support Dr. Gold's statements. He testified that while at Sophie Davis, he (i) never entered into any collaboration using the primary care facilities with which Dr. Gold had affiliations; (Whaley Depo. Tr. at 84:17–21) (ii) did not help build a research program integrated with clinical practice through CHASM's network of primary care settings (id. at 101:4–8); and (iii) failed to conduct research in the area of primary care (id. at 103:3–7). In addition, when Dr. Gold informed Dr. Whaley that Richard Coico,

then Professor and Chairman of the Department of Microbiology and Immunology at Sophie Davis, was seeking collaborators at CHASM to work on a bioterrorism case study, he told her that he was "not really interested." (Defs. Ex. S.) And when Dr. Lubetkin, another fellow CHASM professor, asked Dr. Whaley to meet with her so that they could compare lecture notes in order to avoid duplication of instruction, Dr. Whaley declined and instead provided her with a link to his course website. (Defs. Ex. U.) Finally, when Dr. Peter Muennig, a substitute faculty member at CHASM, who was preparing to teach a Health Policy course, asked Dr. Whaley if he could observe one of his lectures, Dr. Whaley accused Dr. Muennig of not being "honest and straightforward about [his] intentions, expectations, or motivations." (Defs. Ex. V.)

### c. Lack of scholarship

In her evaluation, Dr. Gold stated, "Dr. Whaley had a productive year with respect to manuscript submissions and publications." (Defs. Ex. R.) Specifically,

> He has furnished 15 manuscripts in his support documents, 9 of which are currently under journal review. Six solo-authored manuscripts on cultural mistrust and diagnosis/hospitalization experiences of African–Americans with mental-health disorders which were "in press" at the time of his application to our faculty have appeared in 2001 and 2002 with dual institutional affiliations noted on three of the manuscripts. Five additional coauthored submissions since his arrival at Sophie Davis represent diversification in topic areas, including factors influencing condom use in African–American students, a pilot of primary preventive intervention for behavior problems in African–American youth, and an epidemiological study of public health effects of bombing in Vieques,

Puerto Rico. The latter manuscript was coauthored by Dr. Whaley and a member of this Department.

(Id.)

There is no minimum number of articles a candidate must publish in order to be reappointed. However, all of the articles Dr. Whaley published during 2001–2002 were in press prior to his appointment at Sophie Davis, and were not part of his production record at Sophie Davis. (See Gold Decl. ¶ 41; Roman Decl. ¶ 26.) In addition, the articles he submitted while at Sophie Davis were unrelated to the primary care concerns at Sophie Davis. (Gold Decl. ¶ 41.)

Dr. Whaley did not ask Dr. Gold to meet with him regarding the evaluation, and did not respond to the evaluation until December 2002. (Defs. Ex. JJ.) By that time, plaintiff had already learned that he had not been reappointed for the 2003–2004 academic year.

#### iv. Two faculty committees unanimously voted not to recommend Dr. Whaley for reappointment

The reappointment process for Sophie Davis faculty is a multi-level one, involving review by committees first at the school level, then at the college-wide level and a final review by the President of City College.

Initially, the Sophie Davis Executive Faculty Committee (the "EFC"), whose voting members consist of the Chairs of the departments and other senior faculty at Sophie Davis, votes upon a recommendation regarding reappointment.

On November 22, 2002, the EFC, which included Dr. Gold, unanimously recommended that Dr. Whaley not be reappointed. (Dean Roman is a member, but has no vote.)

After the EFC voted not to recommend Dr. Whaley for reappointment, his reap-

pointment was reviewed independently by the City College Review Committee, which includes the Provost and deans of all City College schools and divisions, and is charged with reviewing recommendations about reappointment made by the schools and divisions. By a unanimous vote of seven voting members of the committee, the Review Committee voted against recommending Dr. Whaley's reappointment for the 2003–2004 academic year. Dr. Gold is not a member of the Review Committee and did not attend that meeting. Dean Roman, however, was present at that meeting, but did not vote.

By letter, dated November 25, 2002, Zeev Dagan, Provost of City College, notified Dr. Whaley that the Review Committee had voted not to recommend him for reappointment in the Sophie Davis School for the 2003–2004 academic year and advised him of his right to appeal that decision to the President of City College.

A series of letters were then exchanged between Dr. Whaley, Dr. Gold, Dean Roman, and President Williams. On December 1, 2002, Dr. Whaley wrote a letter to Dr. Gold, copied to Dean Roman and President Williams, stating that Dr. Gold's evaluation "was not an accurate reflection of the facts regarding [his] overall performance," and that he could not "believe that [her] recommendation was not critical to the [denial of his reappointment]."

Dr. Whaley appealed to President Williams, by letter dated December 3, 2002. (Defs. Ex. OO.) In this letter, Dr. Whaley states,

I believe that there are two possible reasons for my not being reappointed. The first is retaliation for a letter that I had written alleging racist and discriminatory practices by my department Chair. I have enclosed a copy of that letter and subsequent letters in ex-

changes with Dean Roman. His letters reveal a negative tone and, in my opinion, a position that is neither impartial nor conciliatory. The annual evaluation conducted by Department Chair minimized and misrepresented my performance. I had copies of that evaluation and my response hand delivered to you yesterday. Moreover, the Chair mentioned my allegations of racism in the context of both meeting for my annual evaluation. I was told by the Dean in a meeting with him and the Chair that my failure to retract the letter may have negative consequences for me in the future.

The second possible reason for not getting a reappointment is that the Department has to cut excesses because of the $600,000 deficit in the School's budget. . . .

(Defs. Ex. OO.)

On December 19, 2002, Dean Roman wrote a letter to President Williams, listing examples of Dr. Whaley's "demonstrated pattern of misrepresentations and difficulty in establishing constructive collegial relationships that have limited his development and contribution to the department and the School." (Defs. Ex. KK.) He also appended (i) a December 16, 2002 memorandum from Dr. Gold to Dean Roman, written in response to Dr. Whaley's December 1st letter, and (ii) an undated "draft" memorandum from Dr. Gold to Dr. Whaley, also written in response to Dr. Whaley's December 1st letter.

On January 24, 2003, Dr. Whaley wrote a letter to President Williams, providing additional evidence of his allegations of retaliatory animus and discriminatory practices at CHASM. He told President Williams that both Dr. Raggio and Susan Richardson both agreed to be interviewed regarding their experiences at CHASM. In addition, Dr. Whaley suggested that President Williams contact Dr. Wilder, a professor who interviewed for the position of Assistant/Associate Medical Professor of Health Policy at CHASM, but was not hired. Dr. Whaley stated that Dean Roman told him, "Dr. Gold did not think [Dr. Wilder] would be appropriate because of the fact that she was an Orthodox Jew and that her religious beliefs would bias her perspective in teaching." (Defs. Ex. QQ.) According to Dr. Whaley, this evidenced Dr. Gold's "tendency toward ethnic and racial bias . . . ." (Id.)

In a letter to Dr. Whaley, dated February 26, 2003, President Williams denied his appeal. (Defs. Ex. RR.)

Dr. Whaley subsequently requested a statement of reasons for the denial. President Williams responded via letter dated March 19, 2003. (Defs. Ex. TT.) He stated that, in his academic judgment, Dr. Whaley had not made substantial progress in grant submissions as was expected of an individual appointed as a full professor. Specifically, he wrote, " . . . [A]s I review the Board's criteria for reappointment in light of the standards it has established, I find in my academic judgment, that in the area of item (ii) *Scholarly and Professional Growth*, that there is insufficient evidence of research in progress, publications in professional journals, development of improved instructional materials and participation in activities of professional societies." (Defs. Ex. TT.) He also concluded that Dr. Whaley's record showed minimal evidence of a willingness by Dr. Whaley to work collaboratively with other members of his department, "although that ability and requirement was clearly part of [Dr. Whaley's] original hiring criteria and it is clearly part of the academic environment." (Williams Decl. ¶ 20; Defs. Ex. TT.)

The letter concluded that:

In summarizing my review of your total performance, it is my academic judg-

ment, consistent with my role as President, and in keeping with the needs and mission of the College, that you failed to meet the criteria for reappointment as outlined in the Board's statement and as documented herein. I have reviewed your entire file and those additional materials submitted during your appeal in light of the Board's document wherein it clearly defines the criteria for reappointment. It is my academic judgment that your record does not merit your reappointment as Professor in the Sophie Davis School of Biomedical Education and therefore your appeal is denied.

(Defs. Ex. TT.)

Jackson P. Sekhobo, an African–American male, was hired at the rank of Assistant Medical Professor (Basic Sciences) in CHASM to replace Dr. Whaley. He started in that position on July 15, 2004.

### C. Procedural history

#### 1. EEOC proceedings

On August 26, 2003, Dr. Whaley filed a charge of race and age discrimination and retaliation against Sophie Davis with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Defs. Ex. SSS.) The complaint contained two subject headings: race discrimination and retaliation. There is no mention of Dr. Whaley's termination in the race discrimination section.

On or about April 6, 2004, Dr. Whaley filed an amended charge of race and age discrimination and retaliation against Sophie Davis and CUNY with the EEOC. (Defs. Ex. TTT.)[1] The complaint mentioned above was appended to the amended charge. The amended charge states:

"The respondents have subjected me to a continuing practice of discriminatory treatment based on my race and age, and have retaliated against me for complaining of their discriminatory conduct.... Their discriminatory practice and retaliatory conduct continued throughout my employment and culminated with their wrongful termination of my employment in or about August 2003." (Id.) It also includes a disparate impact allegation. (Id.)

On July 7, 2004, the EEOC issued a notice of right to sue with respect to Dr. Whaley's charge. (Ex. UUU.) On November 16, 2004, the EEOC issued a notice of right to sue with respect to Dr. Whaley's amended charge. (Defs. Ex. VVV.)

#### 2. This action

On September 7, 2004, Dr. Whaley filed the complaint in this action with the Clerk of the Southern District of New York. On June 1, 2005, Dr. Whaley filed an amended complaint, alleging that (i) CUNY and Sophie Davis discriminated against Dr. Whaley in the terms and conditions of his employment, subjected him to disparate treatment on the basis of his race, forced Whaley to work in a hostile environment, and retaliated against Dr. Whaley for complaining of their discriminatory conduct, in violation of 42 USC sec.2000e *et seq.*; (ii) President Williams, Dr. Gold, and Dean Roman, in their official capacities, engaged in the discriminatory conduct described in the amended complaint because of their racial animus, and thereby denied Dr, Whaley equal protection under the law in violation of the Fourteenth Amendment, and the right to make and enforce contracts, in violation of 42 USC sec 1981; (iii)

---

1. In the amended complaint, plaintiff explains that the amended charge and amended EEOC complaint were filed in response to the EEOC's request that plaintiff submit a rebuttal to defendant's response to the original charge. Instead of treating the rebuttal and amended complaint as part of plaintiff's original charge, the EEOC treated them as a new complaint and assigned them a new EEOC charge number.

President Williams, Dr. Gold, and Dean Roman, in their individual capacities, subjected Dr. Whaley to discriminatory treatment because of their racial animus, and their conduct had a disparate impact on Dr. Whaley in violation of the Fourteenth Amendment and 42 USC sec 1983; (iii) President Williams, Dr. Gold, and Dean Roman, in their individual capacities, subjected Dr. Whaley to discriminatory treatment because of their racial animus, and thereby deprived Dr. Whaley of his right to make and enforce contracts and to the full an equal benefits of all laws and proceedings for the security of his employment, in violation of the Fourteenth Amendment and 42 USC sec 1981; President Williams, Dr. Gold, and Dean Roman, in their individual capacities, subjected Dr. Whaley to disparate treatment, based on ace and age, in violation of N.Y. Exec. L. Sec. 290 *et seq.* and NYC Admin. Code sec. 8–107 *et seq.*

On January 27, 2006, Dr. Whaley moved for leave to file a further amended complaint alleging that the termination of his employment (failure to reappoint) was motivated by race as well as retaliation. By oral decision and order, dated March 1, 2006, Magistrate Judge Gabriel W. Gorenstein denied plaintiff's motion to amend, ruling that an amendment to allege a discrimination claim concerning the termination of plaintiff's employment would be futile, because the EEOC charge did not contain such a claim. (Order, dated March 1, 2006 denying motion to amend and Oral decision, dated March 1, 2006, pp. 3–8.) Plaintiff timely objected to Judge Gorenstein's order. Unfortunately, nothing happened until this Court was assigned to the case following the death of Judge Richard Conway Casey.

By memo endorsement, dated June 20, 2007, this Court rejected Dr. Whaley's objection to Magistrate Judge Gorenstein's oral decision and declined to permit the second amendment of the complaint, for the reasons stated by Magistrate Judge Gorenstein. (Endorsed Letter, Docket # 57, dated June 20, 2007.)

## DISCUSSION

### A. Standard of review

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence submitted to the court shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–33, 106 S.Ct. 2548. On a motion for summary judgment, the court views the record in the light most favorable to the non-movants and resolves all ambiguities and draws all reasonable inferences against the movants. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir.1987).

 Claims of employment discrimination are analyzed pursuant to the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden initially falls upon the plaintiff to establish a prima facie case of racial discrimination in the terms and conditions of employment. To do so, plaintiff must show that: (1) he

belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he was subject to an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff's membership in that class. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997). The plaintiff's burden in establishing a prima facie case is *de minimis*. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

 Once plaintiff has established a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the termination. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir.2005). If such a reason is established, the burden then shifts back to the plaintiff to establish, by a preponderance of the evidence, that the reasons for his termination were pretextual, and that the motivating factor for his termination was racial discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Courts are required to examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

## B. *Employment discrimination claims*

### 1. *Title VII race discrimination claim*

In his first Cause of Action, plaintiff alleges that CUNY and Sophie Davis violated Title VII by discriminating against Whaley in the terms and conditions of his employment and subjecting him to disparate treatment on the basis of his race.[2]

Plaintiff's amended complaint identifies various aspects of his job that he thought were discriminatory. Plaintiff has abandoned many of those claims by failing to respond and/or not disputing certain statements in Defendants' Rule 56.1 Statement. *See Bogdan v. N.Y. City Transit Auth.*, 2005 WL 1161812, at *3 (S.D.N.Y. May 17, 2005). Specifically, plaintiff has abandoned his claims that he was discriminated against by being forced to submit additional letters of reference; being "forced" to assist "less experienced" faculty with their research; by being subjected to a barrage of emails; by being assigned inadequate sites for course meetings; by being excluded from a curriculum reform subcommittee; and by giving his course materials and curriculum to another faculty member. This leaves him with the following: Dr. Gold's insistence that he respond to CHASM's offer of employment within 24 to 48 hours; Dr. Gold's insistence on receiving the complete grant package before signing; the school's refusal to give him a new computer, rather than a lightly used computer; the initial denial of his request for a paid research assistant; Dr. Gold's failure to invite Dr. Whaley to become a member of the Health Policy Search Committee; the school's initial denial of his request to obtain administrative assistance with grant preparation; Ms. Kilpatrick's insistence that Dr. Whaley's administrative assistant contact her regarding every assignment by plaintiff, to ensure that it was course-related (a requirement she allegedly did not impose on the administrative

**2.** As previously noted, plaintiff's race discrimination claims are based wholly on his alleged treatment while on the job. Neither his EEOC charge nor the amended complaint alleges that he was discriminated against on the basis of race in his termination, and his belated application for leave to amend a second time to add such allegations was denied.

assistants to white faculty members); and Dr. Gold's allegedly unfair evaluation of plaintiff.

Plaintiff admits that, as discrete instances of discrimination, most of these incidents of are time-barred. In this dual filing state, the statute of limitations extends back 300 days from the filing of the charge. As the charge was filed on August 26, 2003, claims relating to discrete acts of discrimination that occurred prior to October 30, 2002 are time barred under Title VII. Dr. Gold's request for a response to CHASM's offer of employment within 24 to 48 hours occurred in April 2001; Dr. Gold's insistence on receiving the complete grant package before signing occurred in December 2001; Sophie Davis' initial denial of his request for a paid research assistant and administrative assistance with grant preparation occurred sometime in 2001; and Dr. Gold's allegedly unfair evaluation of plaintiff was completed in July 2002.

Only three allegations arguably fall within the statute of limitations: the school's refusal to give him a new computer, rather than a lightly used computer (which plaintiff contends was a continuing violation); Dr. Gold's failure to invite Dr. Whaley to become a member of the Health Policy Search Committee (another continuing violation); and Ms. Kilpatrick's insistence that Dr. Whaley's administrative assistant contact her regarding every assignment by plaintiff, to ensure that it was course-related. However, none of these pre-termination actions constitutes an adverse employment action. None qualifies as a continuing violation. And to the extent they might be deemed to do so, no evidence supports any finding of discriminatory animus.

■■■ Under Title VII's anti-discrimination provision, an adverse employment action occurs when a plaintiff sustains a "materially adverse change" in the terms and conditions of employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000); *see also Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).[3] Title VII, however, "does not provide redress for every 'minor, ministerial stumbling block.'" *Beyer v. County of Nassau*, 524 F.3d 160, 166 (2d Cir.2008) (quoting *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997)). Employment actions that the Second Circuit has "deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (quoting *Williams v. R.H. Donnelley Inc.*, 199 F.Supp.2d 172, 178 (S.D.N.Y.2002), *aff'd*, 368 F.3d 123 (2d Cir.2004) (internal quotations omitted)).

■■ Plaintiff's allegations that defendants discriminated against him by (1) providing him with a used computer, (2) not inviting him to be a member of the Health Policy Search Committee, and (3) requir-

---

**3.** In *White*, the Supreme Court distinguished the meaning of "adverse employment action" under Title VII's anti-retaliation provision from the meaning under Title VII's anti-discrimination provision. 126 S.Ct. at 2411–12. Employer actions prohibited by Title VII's anti-discrimination provision are limited to conduct that affects the terms and conditions of employment. *Id.* Under Title VII's anti-retaliation provision, however, the challenged action need not affect the terms and conditions of employment in order to constitute unlawful retaliation. *Id.* The acts under discussion are not alleged to have been retaliatory.

ing his administrative assistant, Ms. Thomas, to contact Ms. Kilpatrick regarding every assignment by plaintiff do not have the hallmarks of adverse employment actions. *See, e.g., Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F.Supp.2d 235, 239 (E.D.N.Y.2003) (no adverse employment action when plaintiff was not put on a committee for the 2001–2002 school year); *Lange v. Town of Monroe*, 213 F.Supp.2d 411, 422 n. 18 (S.D.N.Y.2002) ("Although the lack of assistance from secretarial staff ... would have been understandably frustrating, there is no indication that they resulted in a materially adverse change sufficient to establish an adverse employment action."); *McFadden v. State University of New York, College at Brockport*, 195 F.Supp.2d 436, 457 (W.D.N.Y.2002) ("I do not believe that the inconvenience occasioned by not receiving a new computer rises to [the] level [of an adverse employment action]."). There is no evidence that Ms. Kilpatrick's insistence that Ms. Thomas contact her regarding every assignment by Dr. Whaley impacted Dr. Whaley's ability to receive the administrative assistance to which he was entitled. In addition, the undisputed evidence demonstrates that plaintiff was one of many faculty members of all races and genders and ages who reused a perfectly good computer for which the taxpayers of New York paid their hard-earned tax dollars.

■ In any event, the school's refusal to provide Dr. Whaley with a new computer and Dr. Gold's alleged failure to invite Dr. Whaley to become a member of the Health Policy Search Committee are time-barred, because they are not continuing violations.[4] Discrete incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing viola-

tion. *See Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994); *Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2d Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339. The plaintiff received a used computer in the spring or summer of 2001, which is well outside the limitations period. He was not placed on the Health Policy Search Committee when the committee reopened the search in Fall 2001, which is also outside the limitations period. The fact that the effects of these were felt during the 300–day period does not make them continuing violations. *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 135 (2d Cir.2003). There is no proof of specific ongoing discriminatory polices or practices, or evidence that these incidents went unremedied for so long as to amount to a discriminatory policy of practice.

**2. Section 1981, section 1983, New York Executive Law § 290, and NYC Administrative Code § 8–107 claims against Dean Roman, Dr. Gold, and President Williams**

*i. Section 1981*

To the extent Dr. Whaley seeks to vindicate any independent rights under 42 U.S.C. § 1981, he must do so via claims under § 1983. *Jett v. Dallas Indep.Sch. Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

■ In *Jett*, the Supreme Court held that "the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id.* The holding in *Jett* has been interpreted to encompass not only

---

4. There is nothing in the record that indicates when Ms. Kilpatrick first advised plaintiff that

his administrative assistant would have to contact her regarding all assignments.

governmental entities, but also individuals sued in their individual capacities who are "state actors." *Roddini v. City University of New York,* 2003 WL 435981, at *5 (S.D.N.Y. Feb. 21, 2003); *Jett, supra,* 491 U.S. at 731–35, 109 S.Ct. 2702. "State employment has generally been deemed sufficient to render the defendant a 'state actor.'" *Roddini, supra,* 2003 WL 435981, at *5.

There is some question as to whether § 1981(c), added to § 1981 as part of the Civil Rights Act of 1991, creates an implied private right of action against state actors under § 1981, thereby statutorily overruling *Jett.* Compare *Dennis v. County of Fairfax,* 55 F.3d 151 (4th Cir.1995) (amendment did not disturb *Jett*), with *Fed'n of African Am. Contractors v. City of Oakland,* 96 F.3d 1204, 1205 (9th Cir. 1996) (Section 1981(c) overrules *Jett*). The Second Circuit has not yet ruled on this issue. *See Anderson v. Conboy,* 156 F.3d 167, 178 n. 19 (2d Cir.1998). I, like other district courts in this Circuit, decline to deviate from the Supreme Court's analysis of § 1981 in *Jett. See Edwards v. Town of Huntington,* 2007 WL 2027913 (E.D.N.Y. July 11, 2007); *Roper v. Hynes,* 2006 WL 2773032, *12 (S.D.N.Y. Sept. 27, 2006); *Bond v. City of Middletown,* 389 F.Supp.2d 319, 327–28 (D.Conn.2005); *Perry v. Metropolitan Suburban Bus Auth.,* 319 F.Supp.2d 338, 341–42 (E.D.N.Y.2004); *Hill v. Taconic Developmental Disabilities Services Office,* 283 F.Supp.2d 955, 957–58 (S.D.N.Y.2003), *Sullivan v. Newburgh Enlarged School Dist.,* 281 F.Supp.2d 689, 708 (S.D.N.Y.2003); *Roddini, supra,* 2003 WL 435981, at *5; *Mack v. Port Auth.,* 225 F.Supp.2d 376, 383 (S.D.N.Y.2002). In any event, as noted, Dr. Whaley does not assert any substantive right under § 1981 that is not encompassed in his § 1983 claims,

*ii. Section 1983, New York Executive Law § 290, and NYC Administrative Code § 8–107*

Although they are brought under different statutes, these claims are all subject to the *McDonnell Douglas* analysis mentioned above. *See Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir.2004) (applying *McDonnell Douglas* analysis to discrimination claims brought pursuant to 42 U.S.C. § 1983); *Knight v. New York City Housing Authority,* 2007 WL 313435, at *10 (S.D.N.Y. Feb. 2, 2007) (same for claims under New York Human Rights Law and New York City Administrative Code). The only difference is that Dr. Whaley added a claim for age discrimination under the state and local statutes.

The same things that plaintiff identified as discriminatory under Title VII are the basis for his § 1983, state and local claims.

Because plaintiff filed this action on September 7, 2004, no discrete actions that occurred before September 7, 2001 are actionable under § 1983, New York Executive Law § 290, and NYC Administrative Code § 8–107. *See Harris v. City of New York,* 186 F.3d 243, 247–48 (2d Cir.1999) (three-year statutes of limitations for § 1983); CPLR 214(2) (same for New York State Human Rights Law); New York City Admin. Code § 8–502(d) (same for New York City Human Rights Law). This leaves Dr. Whaley with the following under § 1983, New York Executive Law § 290, and NYC Administrative Code § 8–107: Dr. Gold's insistence on receiving the complete grant package before signing; the school's refusal to give him a new computer, rather than a lightly used computer; the initial denial of his request for a paid research assistant; Dr. Gold's failure to invite Dr. Whaley to become a member of the Health Policy Search Committee; the school's initial denial of his request to

obtain administrative assistance with grant preparation; Ms. Kilpatrick's insistence that Dr. Whaley's administrative assistant contact her regarding every assignment by plaintiff, to ensure that it was course-related—a requirement she allegedly did not impose on the administrative assistants to white faculty members; and Dr. Gold's allegedly unfair evaluation of plaintiff.

As a preliminary matter, all § 1983, N.Y. Executive Law and N.Y.C. Administrative Code claims against President Williams for age and/or race discrimination are dismissed. In the amended complaint, plaintiff alleges that defendants President Williams subjected Dr. Whaley to discriminatory treatment based on his race (and age, under state and local law). However, in his opposition papers, plaintiff states that his claim against President Williams is based *solely* on retaliation, not age and race discrimination. (Pl. Opp. at 19, n. 2.) Thus, President Williams is entitled to summary judgment on these race and age discrimination claims.

Dr. Gold and Dean Roman are entitled to summary judgment on all but one of these race and age-based employment discrimination claims, because only one of these actions constitutes an adverse employment action. And to the extent the others might be deemed to do so, no evidence supports any finding of discriminatory animus.

■ I have ruled that plaintiff's allegations that defendants discriminated against him by providing him with a used computer; not inviting him to be a member of the Health Policy Search Committee; and requiring his administrative assistant to contact Ms. Kilpatrick regarding every assignment by plaintiff do not constitute adverse employment actions. Likewise, Dr. Gold's insistence on receiving the complete grant package before signing; the school's initial denial of his request for a paid research assistant; and the school's initial denial of his request to obtain administrative assistance with grant preparation do not have the hallmarks of adverse employment actions.

Dr. Gold's insistence that she receive a "full" grant package before signing plaintiff's grant transmittal form did not result in a materially adverse change in the terms and conditions of plaintiff's employment. In addition, the undisputed evidence demonstrates that plaintiff received the administrative assistance to which he was entitled. *See* Whaley Decl. ¶ 40; *Lange, supra,* 213 F.Supp.2d at 422 n. 18.

■ The only race discrimination claim that survives summary judgment concerns Dr. Gold's allegedly unfair evaluation of plaintiff. A negative evaluation, accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action. *See Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 247 (S.D.N.Y.2001); *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 284 (S.D.N.Y. 1999). Although plaintiff does not specifically allege that Dr. Whaley was terminated (or not reappointed) in November/December 2002 because of Dr. Gold's July 2002 evaluation, a reasonable person could infer that the evaluation was made available to the EFC, and that it played a role in the committee's decision not to reappoint plaintiff. The evaluation was certainly available to President Williams when considering Dr. Whaley's appeal, as Dr. Whaley hand-delivered it to him on December 2, 2002, along with his response to that evaluation. (See Defs. Ex. OO.) That, together with other evidence of racial and/or ethnic bias on Dr. Gold's part (*e.g.,* Dean Roman's alleged comment that Dr. Gold only wanted to hire white females for faculty positions at CHASM, Dr. Whaley's allegation that Dr. Gold did not invite him

or Dr. Raggio to become a member of the Health Policy Search Committee, Dean Roman's alleged comment that Dr. Gold did not want to hire Dr. Wilder because of her religious beliefs), is enough to get him to a jury on his claim of race discrimination.

■ There is no evidence, however, that any of these slights were motivated by age discrimination. The only evidence Dr. Whaley cites to support his age discrimination claim is an alleged remark by Dean Roman to Dr. Whaley that Dr. Gold had difficulty dealing with "senior" faculty. (Am. Cplt. Ex. I, ¶ 41.) There is no evidence that the term "senior faculty" refers to age, rather than rank. In addition, President Williams, Dean Roman, Dr. Gold and Yvonne Kilpatrick are all older than Dr. Whaley, which cuts against an inference of discriminatory animus. (Williams Decl., ¶ 1; Roman Decl., 1; Gold Decl., ¶ 2; Kilpatrick Decl., ¶ 1.)

### 3. Title VII hostile work environment claim

Plaintiff alleges that defendants CUNY and Sophie Davis violated Title VII by forcing Dr. Whaley to work in a racially hostile work environment.

The same things that plaintiff identified as racially discriminatory are the basis for his hostile work environment claim. They are equally insufficient to establish his racial hostile work environment claim.

■ "To defeat a motion for summary judgment on a racially hostile work environment claim, 'a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 227 (2d Cir.2004) (quoting *Cruz*

*v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted)). The harassment must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Terry v. Ashcroft,* 336 F.3d 128, 147–48 (2d Cir.2003) (quoting *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (internal quotations omitted)); *see also Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). This test has objective and subjective elements: "the misconduct must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Terry, supra,* 336 F.3d at 148 (citing *Alfano, supra,* 294 F.3d at 374) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A court should look at the "totality of the circumstances" and consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris, supra,* 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295).

■ No reasonable person could conclude that plaintiff was forced to work in a hostile environment, because plaintiff has neither alleged nor adduced evidence of *any* "intimidation, ridicule, or insult" at CHASM.

### C. Title VII retaliation claim

Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee because he has "opposed" a practice that Title VII forbids of has "made a charge, testified, assisted, or participated in" a Title VII "investigation,

proceeding, or hearing." § 2000e–3(a). Plaintiff alleges that CUNY and Sophie Davis violated Title VII by terminating him in retaliation for his complaints of their discriminatory conduct. Although plaintiff's case is (to put it charitably) thin, I must allow it to go before a jury.

 In order to establish a prima facie case of retaliation, a plaintiff must prove that: (1) he was engaged in a protected activity; (2) defendants were aware of the protected activity; (3) he was subjected to an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996); *see also Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000): *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768–69 (2d Cir.1998).

 If the plaintiff establishes a prima facie case of retaliation, the defendant may proffer a legitimate, non-retaliatory reason for its actions. *Reed, supra,* 95 F.3d at 1181; *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089. In fulfilling this burden, the defendant need not prove absence of discrimination. *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980). Rather, the defendant need only show that it acted on a neutral basis. *Id.* The employer's hiring practices need not be "rational, wise, or well-considered—only . . . non-discriminatory." *Powell v. Syracuse University,* 580 F.2d 1150, 1157 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). The evidence the employer presents should be objective. *Sweeney v. SUNY Research Foundation,* 711 F.2d 1179, 1185 (2d Cir.1983). Objective factors include evidence that a plaintiff's qualifications do not meet those required for a job. *See id.; Ottaviani v. State University of New York at New Paltz,* 679 F.Supp. 288, 298 (S.D.N.Y.1988),

*aff'd,* 875 F.2d 365 (2d Cir.1989). "A defendant's subjective evaluation of objective criteria also is acceptable, but should be specific and not speculative." *Ottaviani, supra,* 679 F.Supp. at 298 (citing *Sweeney, supra,* 711 F.2d at 1185–86).

If the defendant articulates such a reason, the plaintiff then bears the burden of proving that the proffered reason is merely pretextual. *Reed, supra,* 95 F.3d at 1181.

### 1. Prima facie case

Plaintiff was clearly subjected to an adverse employment action—he was not reappointed. The issue is whether plaintiff was engaged in a protected activity, and whether there was a causal connection between the protected activity and the adverse employment action.

#### i. Protected activity

 To establish participation in a protected activity, a plaintiff need not prove that the conditions against which he protested actually amounted to a violation of Title VII. *Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 134 (2d Cir. 1999); *Reed, supra,* 95 F.3d at 1178; *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). Rather, a plaintiff "must demonstrate only that he had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Wimmer, supra,* 176 F.3d at 134 (quoting *Manoharan, supra,* 842 F.2d at 593). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 292 (2d Cir. 1998) (citing *Reed, supra,* 95 F.3d at 1178).

Usually, the protected activity takes the form of filing a formal complaint with an agency or filing a lawsuit. *See, e.g., Cos-*

*grove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993); *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991); *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990); *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987), *cert denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). However, the Second Circuit has stated, "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 65 (2d Cir.1992) (quoting *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989)); *see also EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012–14 (9th Cir.1983) (writing letter to customer of employer complaining about inadequacies in employer's affirmative action program); *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1136–37 (5th Cir. Unit A 1981) (boycotting and picketing of store), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Coleman v. Wayne State University,* 664 F.Supp. 1082, 1092 & n. 5 (E.D.Mich.1987) (stating repeatedly in public and private that university engaged in discriminatory employment practices).

In this case, Dr. Whaley had not filed a formal agency complaint before he was fired, but he did write a letter to Dean Roman on December 4, 2001, complaining that Dr. Gold attempted to "micromanage" him in her review of his grant application, and that Dr. Gold did not include him or Dr. Raggio, a fellow minority CHASM professor, on the Health Policy Search Committee. Dr. Whaley stated, "Dr. Gold's patterns and practices with respect to faculty of color raises questions about civil rights." (Defs. Ex. 6.) This letter, on which plaintiff's retaliation claims are based, certainly put Dean Roman on notice that plaintiff believed discrimination was occurring. Dr. Gold's deposition testimony demonstrates that Dr. Gold interpreted Dr. Whaley's complaints as allegations of race-based discrimination. (Depo. Tr. of Marthe Gold, pp. 41–43.) Indeed, if plaintiff is to be believed, Dr. Gold was angry because she was being called a racist, which contributed to her negative evaluations of plaintiff. Also, Dr. Whaley complained of retaliation in his appeal to President Williams following the EFC's vote not to reappoint.

#### ii. Causation

"[C]ausation can be established by showing that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." *Uddin v. City of New York,* 427 F.Supp.2d 414, 432 (S.D.N.Y. 2006) (citing *Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir. 1990); *DeCintio, supra,* 821 F.2d at 115).

To support an inference of retaliatory animus, plaintiff points to: (1) Dean Roman's statement that he wanted plaintiff's December 4, 2001 letter to disappear and that it would have negative repercussions on his career at CHASM; (2) Dr. Gold's threats to take legal action against him; (3) Dr. Gold's mentioning twice during an evaluation that plaintiff called her a racist; and (4) Dr. Gold's use of a stricter "premature" reappointment standard when evaluating plaintiff. Defendants dispute that Dean Roman made such statements and that Dr. Gold made any threats of legal action. This Court cannot resolve such factual disputes. Dr. Gold, however, does not deny mentioning (twice) during Dr. Whaley's evaluation meeting that he called her a racist and/or that she used a stricter reappointment standard when evaluating plaintiff.

406

 Additionally, there is a dispute regarding the presence of temporal proximity. For mere temporal proximity to establish causality, the intervening period must be "very close." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Causal connection cannot be established based upon temporal proximity where the alleged adverse employment action is too temporally remote from the alleged protected activity. *See id.* at 273–74, 121 S.Ct. 1508 (noting that "the cases that accept mere temporal proximity between an employer's knowledge of the protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'") (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (3–month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–1175 (7th Cir.1992) (4–month period insufficient)).

Nearly a year separates the protected activity (the letters and meetings between Dr. Whaley, Dean Roman and Dr. Gold) and the alleged retaliatory action (termination). However, plaintiff argues that Dr. Gold and Dean Roman could not act on their alleged threats of "negative career repercussions" until November 2002, because CUNY had a set time for making reappointment decisions. Plaintiff asserts that, as soon as they were able to do so, Dr. Gold and Dean Roman acted on their threats, through their participation on the committees that voted not to reappoint plaintiff. Whether this constitutes temporal proximity must be left to a jury.

Furthermore, plaintiff wrote a letter to President Williams on January 24, 2003, complaining of discrimination at CHASM and of retaliation relating to his non-reappointment. This was only one month before President Williams denied Dr. Wha-

ley's appeal from the decision not to reappoint him.

### 2. Legitimate, nonretaliatory reason for plaintiff's non-reappointment

The record certainly demonstrates that CUNY and Sophie Davis had a legitimate, nonretaliatory reason for denying plaintiff's reappointment. Dr. Whaley did not meet CUNY's criteria for appointment as a Full Professor in the areas of scholarship and professional growth and service to the institution.

In tenure and reappointment cases, a number of courts have found that deficient scholarship is a legitimate, non-discriminatory reason to deny reappointment and/or tenure. *See, e.g., Ottaviani,* 679 F.Supp. at 332; *Lieberman, supra,* 630 F.2d at 65; *Lynn v. Regents of University of California,* 656 F.2d 1337, 1344 (9th Cir.1981), *cert denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982).

 In this case, it is undisputed that Dr. Whaley wrote no articles at Sophie Davis that were published during his tenure (anything he published while at Sophie Davis had been written prior to his arrival). While there is no minimum number of articles a candidate must publish in order to be reappointed, Dr. Gold and Dean Roman's sworn statements that plaintiff's scholarship was inadequate to merit reappointment satisfies defendants' burden of production. (*See* Gold Decl. ¶¶ 37–45; Roman Decl. ¶¶ 23–29.)

In addition, defendants produced evidence that plaintiff did not make efforts to obtain sufficient outside funding for research. Plaintiff had only one funded grant in the amount of $4,500 at CUNY, and plaintiff missed two cycles for resubmission for the other grant he submitted to CUNY. Plaintiff also acknowledged that his research was not congruent with his

department's focus on primary care. (Whaley Depo. Tr. P. 101.)

### 3. Pretext

 Because defendants have articulated a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture. *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir.2000); *Hicks, supra*, 509 U.S. at 510–11, 113 S.Ct. 2742; *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997). "For the case to continue, the plaintiff must ... come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock, supra*, 224 F.3d at 42. "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (internal quotations omitted). It is not enough to disbelieve the employer; the Court must also believe the plaintiff's explanation of intentional discrimination, *Id.*; *Hicks, supra*, 509 U.S. at 519, 113 S.Ct. 2742.

 Plaintiff points to the following as direct evidence of retaliation: (i) Dean Roman's statement that he wanted plaintiff's December 4, 2001 letter to "disappear"— that it would have negative repercussions on his career at CHASM, and that he did not wish to receive any more letters on the subject; (ii) Dr. Gold's threat to take legal action against plaintiff for having defamed her; (iii) the fact that Dr. Gold conducted plaintiff's annual evaluation; (iv) Dr. Gold's statements during plaintiff's evaluation meeting that plaintiff called her a racist; (v) the fact that Dr. Gold sat on the Executive Faculty Committee; (vi) the fact that Dean Roman also sat on this committee (although he had no vote); and (vi) the fact that Sophie Davis and CUNY used the wrong, "stricter" standard when deciding whether to reappoint him in November 2002. As noted above, there is a dispute over whether some of these events occurred. This evidence of pretext is far from overwhelming—in fact it is barely sufficient, in view of the extremely strong evidence put forth by· defendants at the second *McDonnell Douglas* phase concerning Dr. Whaley's performance. However, this court is not permitted to weigh evidence. I am constrained to send the issue of retaliation to trial.

### CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED in part and DENIED in part. What is left of the case will be tried on July 21, 2008. The Court is allotting three days for trial. The final pre-trial conference will be held on July 2, 2008 at 10:00 a.m. This constitutes the decision and order of the Court.